Arthur Lee WILLIAMS, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 69147.

Court of Criminal Appeals of Texas,
En Banc.

Jan. 23, 1991.

Rehearing Overruled Feb. 27, 1991.

James Stafford, Carol J. Carrier, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., and Timothy G. Taft and Keno Henderson, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON REMAND

OVERSTREET, Judge.

The appellant, Arthur Lee Williams, Jr., was convicted of capital murder pursuant to V.T.C.A. Penal Code, § 19.03(a)(1). The death penalty was imposed by the trial court after the jury answered affirmatively the special issues submitted under Article 37.071(b), V.A.C.C.P. This Court on original submission affirmed appellant's conviction and death sentence. *Williams v. State*, 682 S.W.2d 538 (Tex.Cr.App.1984). Subsequently, appellant requested a writ of certiorari from the United States Supreme Court. The basis of his application to the High Court was that in his direct appeal to this Court he claimed, *inter alia*, that the "trial court committed reversible error by not quashing the venire where it was shown that the Prosecutor exercised six peremptory challenges against black jurors in violation of appellant's Sixth and Fourteenth Amendment Rights guaranteed under the U.S. Constitution." This contention was indeed rejected under *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), as appellant failed to demonstrate that the exercise of the questioned peremptory challenges were made pursuant a systematic scheme of exclusion.

*Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), was decided while appellant's petition for writ of certiorari was pending before the United States Supreme Court. *Batson*, in essence, held the "State's purposeful or deliberate denial of jury participation to black persons because of race violates a defendant's rights under the Equal Protection Clause of the United States Constitution." *Keeton v. State*, 749 S.W.2d 861 (Tex.Cr.App. 1988). Therefore, the prosecutor's exercise of a peremptory challenge solely on the basis of the venireperson's race is expressly forbidden. Subsequently, the Supreme Court concluded that the dictates of *Batson* are to be retroactively applied to all cases on direct appeal and to those cases that were not final at the time that the *Batson* decision was issued. *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). This case was remanded to this Court and in turn we remanded it to the trial court to conduct what is now commonly called a *Batson* hearing. *Williams v. State*, 731 S.W.2d 563 (Tex.Cr. App.1987). The transcription of the *Batson* hearing and the trial court's pertinent findings of fact and conclusions of law have now been forwarded to this Court for review.

In the case *sub judice*, the record reveals that appellant, Arthur Lee Williams, Jr., was a black person and no black individual served upon the jury which convicted him of capital murder and answered all the special issues submitted to them at the punishment phase of the trial in the affirmative. It is undisputed that the State had exercised six of their twelve expended peremptory challenges on black members of the venire: Mansfield Nelson, Jennie Henley, Pearlie Keller, Gussie Jones, Wilburn Gibson, and Nan Roque.

The fundamental holding of *Batson* was set out in *Griffith* when the Supreme Court opined:

> In *Batson, id.*, at 94–99, 106 S.Ct. at 1722–1724, this Court ruled that a defendant in a state criminal trial could establish a prima facie case of racial discrimi-

nation violative of the Fourteenth Amendment, based on the prosecution's use of peremptory challenges to strike members of the defendant's race from the jury venire, and that, once the defendant had made the prima facie showing, the burden shifted to the prosecution to come forward with a neutral explanation for those challenges.[1]

■ Thus, the Supreme Court rejected the "crippling burden of proof" previously required under *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), necessary to establish a prima facie case of purposeful racial discrimination in the exercise of the peremptory challenges

1. In *Batson*, 106 S.Ct., at 1723, the Supreme Court said:

> ... To establish such a case, the defendant first must show that he is a member of a cognizable racial group, *Castaneda v. Partida*, supra, 430 U.S. [482], at 494, 97 S.Ct. [1272], at 1280 [51 L.Ed.2d 498 (1977)], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of the mind to discriminate." *Avery v. Georgia*, supra, 345 U.S. [559] at 562, 73 S.Ct. [891], at 892 [97 L.Ed. 1244 (1953)]. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in empanelling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.
>
> In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.
>
> Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for the challenging black jurors.

by the State. However, as in any equal protection case, the burden of production as well as persuasion remains with the appellant who is asserting the claim that the prosecutor engaged in a discriminatory selection process to arrive at the petit jury, and therefore must "prove the existence of the purposeful discrimination." [2] See *Whitus v. Georgia*, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967). Subsequent to the *Batson* hearing ordered in this cause, the trial court reviewed the evidence adduced therein, and the record established during the initial voir dire and in pertinent part entered the following findings of fact and conclusions of law:

2. In *Batson*, supra, the Supreme Court seemed to indicate that the same prima facie burden of proof rules applicable in the context of Title VII cases are also operational in the *Batson* situation. In *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the High Court adequately summarized these rules:

> In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), we set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment. First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.*, at 802, 93 S.Ct., at 1824. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Id.*, at 804, 93 S.Ct., at 1825.
>
> The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. See *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25, n. 2, 99 S.Ct. 295, 296, n. 2, 58 L.Ed.2d 216 (1978); *id.*, 29, 99 S.Ct., at 297 (STEVENS, J, dissenting). See generally 9 J. Wigmore, Evidence § 2489 (3d ed. 1940) (the burden of persuasion "never shifts"). The McDonnell Douglas division of intermediate evidentiary burdens serves to bring the litigants and the court expeditiously and fairly to this ultimate question. [Footnotes omitted.] 101 S.Ct., at 1093–1094.

8. The defendant is an identifiable minority, i.e. black.

9. There were no blacks on the jury that tried the defendant and assessed the death penalty.

10. Six of the State's twelve peremptory challenges were exercised against the following black veniremen: Mansfield Nelson, Jennie Henley, Pearlie Keller, Gussie Jones, Wilburn Gibson and Nan Roque.

11. Although prosecutors Henderson and Davidson both conducted voir dire of the above-referenced veniremen, prosecutor Henderson had ultimate responsibility for exercising the peremptory strikes. Accordingly, Mr. Henderson provided the reasons for the State striking the six black veniremembers. (Hearing, p. 58.)

12. The court finds that the prosecutor's general strategy in selecting a capital jury, including the jury in the instant case, is to accept the first twelve (12) people who can return a death penalty verdict under the unique set of facts presented in the subject case. (Hearing, p. 51). In the case at bar, the prosecutor looked for a juror who was: (a) intelligent; (b) capable of understanding the issues and concentrating on them without outside interference; (c) capable of making an informed decision based upon the evidence; and, (d) not prejudiced against either police officers or the State. (Hearing, pp. 51–54).

13. This court further finds that the above-referenced method of jury selection employed by the prosecutor in the instant case is race-neutral and does not utilize race, creed or color as a means of purposefully or deliberately denying jury participation to any person, including black persons.

14. The prosecutor exercised a peremptory challenge against Mansfield Nelson for the following race-neutral reasons:

(a) Mr. Nelson did not believe in the death penalty under any circumstances and did not believe that a person's life should be taken by lethal injection;

(b) his beliefs against the death penalty were based on personal and religious convictions and were beliefs which he had held for many years;

(c) Mr. Nelson's responses indicated to the prosecutor that Mr. Nelson would find it difficult, if not impossible, to answer the special issues "yes" knowing that the court would assess the death penalty, and would conceivably answer one of the special issues "no" to avoid giving the death penalty, even if he was convinced beyond a reasonable doubt that the answer to the special issue should be "yes";

(d) he could not take part in a proceeding where the death penalty was involved and did not want a death sentence "on his conscience";

(e) Mr. Nelson's feelings against the death penalty were strong and indicated that he could not follow or apply the law concerning capital punishment, even if the person charged had killed a half-dozen people;

(f) he became agitated with the prosecutor during the course of the voir dire, leaving the prosecutor with the feeling that he had poor rapport with Mr. Nelson;

(g) during cross-examination by defense counsel, Mr. Nelson changed many of his answers concerning the death penalty, causing the prosecutor to doubt both Mr. Nelson's candor and his ability to follow the law and fairly decide the case upon the facts.

(R. IX, 756–810; Hearing, 54–58).

15. The prosecutor exercised a peremptory challenge against Jennie Henley for the following race-neutral reasons:

(a) Ms. Henley demonstrated a predisposition against the punishment sought by the State when she stated that she preferred life imprisonment over the death penalty and indicated that she would not be able to sleep at night if she participated in a decision that resulted in the death penalty;

(b) she had difficulty understanding simple questions and could not express

herself in a coherent manner, problems the prosecutor believed would impair her ability both to understand and apply the law to the facts of the case, as well as her ability to make informed, intelligent decisions;

(c) Ms. Henley referred to "other words" and frequently made no sense, indicating a lack of appreciation for, and understanding of, both the jury's role and the trial process in general;

(d) Ms. Henley had previously served as a juror in a robbery case in which the jury failed to reach a verdict. Her characterization of the robbery case as "no big thing" indicated lack of concern and appreciation for the seriousness of crime, including the instant offense;

(e) she believed that once confronted by another, a person should fight and not worry about whether that person is a police officer, a belief that concerned the prosecutor since a major issue in the instant case was whether the defendant knew the person he killed was a police officer.

(R. XI, 1326–1358; Hearing, pp. 58–62).

16. The prosecutor exercised a peremptory challenge against Pearlie Keller for the following reasons:

(a) the fact that Ms. Keller was unemployed and failed to list any employment history, despite her acknowledgment of three dependents, caused concern about her ties to the community;

(b) Ms. Keller stated that she had asthma, hearing difficulties and three youngsters at home, all of which could affect her ability to serve as a juror;

(c) despite advance notice that she might serve on a capital jury, Ms. Keller stated that she had never thought about the death penalty, indicating a possible lack of concern;

(d) when pressed, Ms. Keller admitted that she had strong, long-standing religious and personal feelings against the death penalty, that she could not participate or even take the oath in a death penalty case, that she could not vote for the death penalty, even if the accused had gunned down several people, and that she would not be a good juror in a capital murder case, all of which demonstrated a predisposition against the death penalty;

(e) Ms. Keller further stated that she would panic if forced to be a juror and that she could not be a fair and impartial juror because of her beliefs, statements which indicated that Ms. Keller would have difficulty listening to the evidence and following the law;

(f) she first stated that she could not answer the special issues, knowing that the death penalty would be assessed. Later, she explained that she could answer the special issues, but would answer them "no" if she had any doubt and admitted that she could never hear enough evidence to make her answer the special issues "yes"; and,

(g) during cross-examination, Ms. Keller gave several answers that were inconsistent with those given during direct examination. These inconsistencies, coupled with her apparent confusion over the the [sic] law and special issues, demonstrated an inability to grasp the pertinent procedure and law.

(R. XIV, 1786–1790; Hearing, pp. 62–67).

17. The prosecutor exercised a peremptory challenge against veniremember Gussie Jones for the following race-neutral reasons:

(a) she first indicated that she could not answer the special issues "yes", but later changed her mind and stated that she could give the death penalty;

(c) [sic] Ms. Jones was solely responsible for the care of two asthmatic children at home. Her responses indicated that this responsibility would not only preclude sequestration, but might also prevent her from giving the required attention to a capital murder case; and

(d) [sic] her confusion with the questions, despite the judge's repeated explanations, and her inconsistent answers demonstrated that she lacked

the intellectual capacity to understand the issues, law and procedures, a deficiency that would impair her ability to make her own decisions and be a fair and impartial juror.

(R. XIV, 1791–1804; Hearing, pp. 67–69).

18. The prosecutor exercised a peremptory challenge against Wilburn Gibson for the following race-neutral reasons:

(a) although Mr. Gibson knew in advance that he was being considered for a capital murder jury, he stated that he had not thought about the death penalty;

(b) his predisposition against the death penalty was evident when he stated that he did not believe in the death penalty, that he felt strongly that society should not have a death penalty, that he did not believe that someone had the right to take another's life, and that he could not vote for the death penalty, even if the accused had killed six people, because he believed that he would be taking someone's life;

(c) Mr. Gibson's statement that he could not answer the special issues because they involved the death penalty disclosed the possibility that he would ignore the court's instructions and answer the special issues "no", even if the State proved beyond a reasonable doubt that they should be answered "yes";

(d) he was the sole supporter of his family, had four dependents at home, and would not get paid if he did not work, factors which made sequestration problematic and raised concerns about his ability to give full attention to the case and facts; and,

(e) on cross-examination Mr. Gibson told defense attorneys that he *could* consider the death penalty for a mass murderer, a position which concerned the prosecutor since it was inconsistent with his prior statement and based on facts far different from the ones of the instant case.

(R. XVI, 2050–2071; Hearing, pp. 69–72).

19. The prosecutor exercised a peremptory challenge against Nan Roque for the following race-neutral reasons:

(a) Ms. Roque was divorced, had a twelve-year old and needed to be home at night, a fact which would inconvenience her and might interfere with her ability to fairly consider the evidence if sequestered;

(b) she was not a strong advocate of the death penalty as evidenced by her statements that death was awful and that she had mixed emotions about the death penalty;

(c) she indicated she might have difficulty following the law because of her beliefs that "beyond a reasonable doubt" was not a high enough burden of proof, that she needed to have *no doubt* concerning all of the evidence before finding a defendant guilty or returning a death verdict, and that she might require the State to prove more than the allegations in the indictment;

(d) Ms. Roque felt that if the defendant or a witness for the defense testified concerning self-defense, he would tell the truth, a viewpoint that concerned the prosecutor since it was anticipated that the defendant might testify in the instant trial;

(e) she expressed a bias against both the law and police officers when she stated that the murder of a police officer should not get preferential treatment, i.e., that it should not be considered capital murder. Additionally, she believed that some police officers were often there to harass people, an opinion that concerned the prosecutor since: (1) her belief was apparently strong enough to warrant her unsolicited recitation of a recent harassment incident; and, (2) there was a real possibility that the defendant might testify to similar harassment by the victim-police officer.

(f) the prosecutor felt that Ms. Roque sometimes talked "in circles" and had some difficulty understanding the pertinent procedures, even after clear explanation from the court.

(R. XVIII, 2341–2374; Hearing, pp. 72–77).

20. The court finds that the State did not systematically exclude black persons from the jury in the instant case.

21. The court also finds that the State's explanations for peremptorily striking veniremen Nelson, Henley, Keller, Jones, Gibson and Roque were neutral, unambiguous and non-racial reasons relative to the defendant's case as required by *Batson v. Kentucky,* —— U.S. ——, 107 S.Ct. 708 (1987) [sic]. The court further finds said explanation to be credible, plausible and legitimate reasons for exercising those peremptory challenges.

## CONCLUSIONS OF LAW

1. With a great deal of indulgence and leniency toward the defense, this court concludes that the defense made a prima facie showing of discrimination by the State in the jury selection process. (Hearing, p. 125.)

2. This court also concludes that the prosecutor in the instant case did not exercise his peremptory challenges in a discriminatory manner to exclude venirepersons based upon racial considerations, nor did he, in any way, purposefully or deliberately deny jury participation to black persons because of race.

■ In *Keeton v. State,* 749 S.W.2d 861, 865 (Tex.Cr.App.1988), we adopted "our own standard of review," of "supported by the record" analysis applicable to *Batson* cases in making the determination as to whether the trial court was correct in its assessment. In *Whitsey v. State,* 796 S.W.2d 707 (Tex.Cr.App.1990) (Opinion on State's motion for rehearing), we concluded that the appropriate standard for review is that enunciated by the Federal courts, to-wit: "clearly erroneous." In adopting the "clearly erroneous" standard of review, as appropriate to *Batson* issues, this Court recognized that the analysis required under "supported by the record" standard of review was synonymous with the analysis required pursuant to the "clearly errone-ous" standard. This Court stated the two standards were usually found in conjunction with each other, and therefore "if the findings of the trial judge are supported by the record, the findings are not then clearly erroneous." Hence since "supported by the record" is but an analytical tool utilized in determining whether the trial court's actions were "clearly erroneous," our analysis is essentially identical. We examine the record to determine whether the race neutral explanation provided by the prosecutor is supported by the record or has the appellant introduced sufficient evidence to establish (or rebut) that the prosecutor expended his peremptory challenges in such a manner that it can rationally be inferred that he engaged in purposeful racial discrimination. The complexity of this review is revealed when we realize that *Batson,* and the cases cited therein, formulated a three part seriatim criterion by which to measure the conduct of the prosecutor in the exercise of his peremptory challenges: (1) Did the appellant at the *Batson* hearing introduce sufficient evidence to establish a *prima facie* case that the State has engaged in purposeful racial discrimination by the use of peremptory challenges?; (2) if so, has the prosecution come forward with a neutral explanation for challenging black jurors?; and, (3) if the prosecution has sustained his burden of production, as specified, has the appellant continued to sustain his burden of persuasion in establishing purposeful racial discrimination by the State's use of peremptory challenges, thus rebutting any race neutral explanation given at the *Batson* hearing.

■ If after viewing the evidence adduced relevant to the *Batson* claim, in the light most favorable to the trial court's ruling, it is determined that the explanations provided by the State have not been overcome by the appellant as required by *Batson,* supra, and its progeny, this Court will deem the trial court's ultimate conclusion that there was no purposeful discrimination in the State's exercise of its peremptory challenges as not "clearly erroneous."

We, therefore, must examine the record to determine whether the explanations provided by the State were indeed race neutral on their face, and if so, whether there is evidence which indicates that, notwithstanding such appearances, the utilization of the jury strikes were nothing more than a pretext for the racially motivated exercise of the peremptory challenge which provided the prosecutor with the opportunity to discriminate.

After reviewing the entire relevant record in this cause (*viz*: the voir dire examinations of the prospective jurors who were peremptorily challenged as well as the evidence presented at the *Batson* hearing which consisted only of the prosecutor's testimony as to why he peremptorily struck each venireperson), we find that findings of fact and conclusions of law entered by the trial court are amply supported by the record, and not clearly erroneous. Put simply, the explanations provided by the prosecutor were race neutral and the evidence presented buttresses the State's position taken at the *Batson* hearing. Naturally in arriving at this determination we have considered the evidence in the light most favorable to the trial court's rulings and conclude that the record supports the proposition that the prosecutor in this cause did not engage in purposeful discrimination by the exercise of a portion of his allotted peremptory challenges on black venirepersons.[3]

In the case *sub judice*, the State exercised six of its twelve expended peremptory challenges against members of appellant's race. No black jurors served on the jury. We will consider the State's explanation asserted to justify the exercise of the strike in which the prosecutor expended them.

Mansfield Nelson was the first black venireperson peremptorily challenged by the State. In appellant's brief, he claims that the prosecutor's basis for sustaining the

exercise of the challenge was nothing more than a sham and pretext to disguise what in reality was racial discrimination on behalf of the State. The argument that is developed by appellant is founded on the premise that the State, in its manner and method of voir dire, was able to intentionally elicit from Nelson his view that he was against the imposition of the death penalty. Put simply, it is claimed that the prosecutor's questioning was calculated and designed to provoke a certain response that was likely to disqualify the prospective juror.

During the initial voir dire conducted by the trial court, Mansfield Nelson emphatically indicated that although he had no conscientious objection or religious scruple against the death penalty, he was nonetheless of such a mind that he did not believe in the imposition of the death penalty.[4] During the State's voir dire of Nelson, in response to questions posed by the prosecutor, Nelson indicated that his opposition to the death penalty was one he had acquired many years ago and that it was his belief that no life should be taken in that manner. Additionally, Nelson related that he would prefer not to take part in such proceeding where it was possible that the trial court could sentence the accused to death. When being queried in regards to the Texas sentencing procedure in a capital case pursuant to Article 37.071, V.A.C.C.P., Nelson replied that notwithstanding the circumstances of the offense it would be impossible for him to answer any of the special issues submitted in the affirmative. In fact Nelson was so ardent in his position that in response to an apparent repetitive query he quibbled, "[t]hat is back to the same question. I just don't believe in the death penalty. And by me saying I don't believe in the death penalty should answer your question."

---

3. Although the trial court in its conclusions of law reluctantly concluded that the appellant had made a prima facie showing of discrimination by the State in the jury selection process, we note that the prima facie showing was similar to that deemed sufficient in *Whitsey v. State*, supra.

4. We observe that there is no claim that the trial court in any manner framed or calculated its voir dire in order to elicit a response from the venireperson so as to subject him to disqualification because of his view towards capital punishment.

Later in the examination the defense seemingly was able to rehabilitate the venireperson to the extent that he could follow the trial court's instructions and answer the special issues based upon the evidence. Shortly thereafter the trial court overruled the State's challenge for cause, and a peremptory challenge was exercised on Nelson.

Two other black venirepersons initially indicated their unequivocal opposition to the death penalty: Pearlie Mae Keller, and Wilburn Gibson. Keller, without directly stating that she was indeed totally against the imposition of the death penalty, told the prosecutor that she did not think that at the punishment phase of a capital murder prosecution she could cast a vote in regards to any submitted special issue which would result in the sentence of death. Among the feeling she expressed on voir dire during the interview by the State was that she would have great difficulty in taking any kind of oath to follow the law if a possible consequence could indeed be the imposition of the death penalty. She did not think she could cast a vote that had the effect of the trial court automatically assessing death, and in the event that she was confronted with making such a decision, it was her belief that she would just "panic." She readily admitted that she just, "... wouldn't be a good juror," because she could not put her feelings aside and ultimately she concluded that her strong sentiments would interfere with her ability to answer the special issues.[5]

Wilburn Gibson was probably the venireperson most susceptible to the examiner of any venireperson interviewed during the entire course of the voir dire phase of the trial. Gibson performed a total transformation in his views toward the imposition of the death penalty. His opinion vacillated depending upon who was the interrogator. In fact, the majority of his answers consisted of the phrase, "Right." From the record, Gibson basically responded to the leading of both the prosecutor and the defense attorney. In substance, during the voir dire by the State, Gibson informed the prosecution that because of his unquestioned opposition to the death penalty, no matter what the evidence demonstrated at the punishment phase, he could never answer in the affirmative any of the special issues submitted by the trial court. Consequently, it could only be concluded that Gibson would consciously distort the evidence in order to answer in the negative. To the contrary, when voir dired by the defense Gibson related that he could indeed consider the death penalty under certain aggravated circumstance.

Gussie Mae Jones, obviously had no belief or opinion which were in opposition to the death penalty, however, upon questioning by the prosecutor did express limitations in the event the jury was sequestered for a lengthy period. Because of these representations a State peremptory challenge was expended. After examining prospective juror Jones concerning her views in connection with the imposition of the death penalty, the prosecutor inquired:

Mr. Henderson [the prosecutor]: I keep thinking in the back of my mind about the fact that you have these children at home. And you indicated it would cause some problem, you being down here.

Is it such a problem [referring to being sequestered] that you just couldn't do that?

Mrs. Jones: Well, one thing, they have, both of them is asthmatics and they are liable to come home with asthma. You never know.

Mr. Henderson: Does that require your attention?

---

5. At this time it is appropriate to observe that as to venireperson Keller, as well as each black venireperson subjected to the State's strike, they were duly rehabilitated by the defense voir dire, and therefore not subject to a proper challenge for cause. However, *Batson*, supra, 106 S.Ct. at 1723, aptly stressed that once the appellant made the initial *prima facie* case of purposeful discrimination and the State was compelled to discharge its burden of going forward with a race neutral explanation for challenging black jurors, such explanation did not need to rise to the level that would justify a challenge for cause.

Mrs. Jones: Most of them I end up taking to the doctor for a shot. One of them has it worser than the other one.

Mr. Henderson: There is nobody there at home to do that?

Mrs. Jones: Nobody.

Mr. Henderson: Is that what you indicated here?

Mrs. Jones: Yes.

Mr. Henderson: Do you think that would cause difficulty with you, having to stay up here; or would it just frankly be impossible for you to stay up here during that period of time if you had to stay up here for a week?

Are you saying you just couldn't do that?

Mrs. Jones: I really couldn't because I don't have anybody else, really, to take care of them.

Mr. Henderson: I am going to excuse Mrs. Jones, Your honor.[6]

Jennie L. Henley who was chronologically the second black venireperson, although evincing the attitude that she had no conscientious, moral or religious scruples against the infliction of the death penalty, did manifest some reservation of actually having to cast a vote for its implementation. Given her choice she would rather assess life imprisonment. This manifestation was expressed when in response to a prosecutorial query she replied. "Well, I hate to say 'death.' I still say—I could hardly sleep at night if I said 'death.' You know, just give him 'life.' Let him sweat it out. That is the only way I feel about it." Henley was by no means obscure; she related she could cast a vote which would ultimately result in the assessment of death, but she had a preference for life imprisonment as an appropriate punishment.

As to the reasons asserted by the State for excusing venirepersons Jones and Henley, appellant in his brief counters:

Analysis of the prosecutor's reasons for striking these qualified black jurors, in the context of their testimony, establishes a pattern of deception. Statements attributed to prospective jurors by the prosecutor at the *Batson* hearing were often intentionally elicited from them or totally misunderstood by the prosecutor when he reviewed the record in preparation for the hearing. The differences in the manner in which the prosecutor questioned these veniremen on the issue of the death penalty and the way that the selected white jurors were questioned have been demonstrated herein and are apparent from the record.

The sixth black juror stricken[7] by the prosecution was Nan Marie Roque. Roque expressed that she did not have any mental reservations concerning the death penalty and that certainly under the appropriate circumstances she would not have a problem in answering in the affirmative any of the punishment special issues. Rather the prosecutor at the *Batson* hearing explained, *inter alia*, that he expended a peremptory on Roque because of her views in reference to the State's burden of proof in a capital murder prosecution and her attitude toward V.T.C.A. Penal Code, § 19.03(a)(1).[8]

During the voir dire, Roque expressed the following viewpoint on the State's burden of proof:

Mr. Henderson: Well, if the State's burden of proof essentially would be "beyond a reasonable doubt," that is all the

6. Defense Exhibit No. 17, which was introduced into evidence at the *"Batson"* hearing, was the written juror information sheet filled out by all prospective jurors, and in response to the question, "Is there anything about your job, family, or personal health that would affect your service as a juror?", Jones explained that asthma presented a problem.

7. In this opinion the venirepersons testimony are not necessarily discussed in the chronological order in which the State expended its strike, but rather the numerical designation refers only to the sequence of discussion in this opinion.

8. Section 19.03(a)(1) supra, in relevant part reads:
(a) A person commits an offense if he commits murder as defined under Section 19.-02(a)(1) of this code and:
(1) the person murders a peace officer or fireman who was acting in the lawful discharge of an official duty and who the person knows to be a peace officer or fireman;

State had to prove its case by, "beyond a reasonable doubt," would you think that that burden would not be enough in a case—a capital murder case?

Mrs. Roque: *No, I don't think it would be enough.*

Mr. Henderson: Okay.

Mrs. Roque: Can I ask a question?

Mr. Henderson: Sure. Maybe I can answer it.

Mrs. Roque: Okay. The first part of the trial where we are determining his guilt or innocence, does "guilt" mean that he definitely did shoot? I am not sure how the person died. But that he definitely killed someone, regardless of the reason?

Would that be "guilty"?

THE COURT: You are looking at me. Do you want me to answer the question?

Mrs. Roque: Yeah, someone, anyone?

THE COURT: The burden of proof the State must shoulder is "beyond a reasonable doubt." It is not "beyond all doubt." It is not "beyond a shadow of a doubt." It is "beyond a reasonable doubt" based on the evidence.

You will not have defined for you the term "beyond a reasonable doubt."

Mrs. Roque: That is not what I am asking.

I am asking—okay—if "beyond a reasonable doubt" we determine that he did in fact kill the individual in question, does it matter at all why he did it? Or is he just "guilty" because of the mere fact that he did kill this person? [Emphasis added.]

In connection with § 19.03(a)(1), supra, Roque espoused the opinion that she was bothered by the statutory capital murder scheme in that it gave preferential treatment to police officers. In response to a direct question posed to her by the prosecution, Roque retorted:

I don't think that anyone should have the right to kill another human being, just go out and kill them.

\*     \*     \*     \*     \*     \*

And it just concerns me because I think some officers are out there to harass people. I have seen it myself. There were—this weekend, for example—three police cars—and why three wreckers, I don't know—stopped one kid—I know he couldn't have been over fifteen years old—on a motorcycle in my neighborhood. That is harassment. And I have seen it. And I don't think that a badge should give anyone the right to harass or to abuse another person.

Rogue was then struck by the State.[9]

In *Keeton*, supra, this Court's progeny born as a direct result of *Batson*, supra, we mandated the appropriate litmus required of the trial under the *Batson*, supra, decision. After a lengthy and exhaustive analysis of available precedent from various jurisdictions which considered the effect of *Batson* prior to the time that this Court had such an opportunity, we enumerated a nonexhaustive list of diverse considerations which were deemed essential for the trial court to utilize in compiling its findings of facts and conclusions of law at the termination of the *Batson* hearing. See *Keeton v. State*, supra, at 865–869. In conducting its fact finding process, the presence of any of the listed factors would weigh against a finding that the race-neutral explanation espoused by the State was legitimate and the State had pursued an opportunity to engage in purposeful discrimination putting forth its explanation as a mere pretext.

■ As further explained in *Keeton*, supra, and the subsequent decision of *Whitsey v. State*, 796 S.W.2d 707 (Tex.Cr.App. 1989) (Opinion on original submission), the Court employed a set of factors deemed useful in making a determination that the State's proffered race-neutral reasons are supported by the record, as well as the trial

---

9. At the *Batson* hearing as to each black juror struck, the prosecutor enumerated a varied of reasons for expending a peremptory challenge as set out in the trial court's findings of fact. For reasons to be more fully developed, infra, we need not discuss the validity of each and every explanation.

court's findings. The factors recounted in the *Whitsey* analysis were:

1. The reason given for the peremptory challenge is not related to the facts of the case;

2. there was a lack of questioning to the challenged juror or a lack of meaningful questions;

3. Disparate treatment—persons with the same or similar characteristics as the challenged juror were not struck;

4. Disparate examination of members of the venire, i.e., questioning a challenged juror so as to evoke a certain response without asking the same question of other panel members; and

5. an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically.

We fail to perceive why these factors would not be equally applicable under the "clearly erroneous" standard of review. See *Keeton* II, at 866, citing *Slappy v. State*, 503 So.2d 350 (Fla.Dist.Ct.1987), affirmed, 522 So.2d 18 (Fla.1988).

As has been reiterated, the trial court's function is to first make a determination as to whether the defendant has made a sufficient *prima facie* showing of purposeful discrimination in the State's exercise of its peremptory challenge, and if so, has the State come forward with a neutral explanation to justify the challenge of the black juror. *Batson*, supra, *inter alia*, made clear that "the prosecutor may not rebut the defendant's *prima facie* case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race." Nor is it sufficient that the prosecutor self-servingly proclaimed that he had no motive or intent to discriminate but only acted in good faith. The prosecutor's explanation must be "clear and reasonably specific," must contain "legitimate reasons," and those reason must be related to the case being tried at the moment. It is integral to the process of the *Batson* hearing that these postulates be considered prior to the trial court's ultimate resolution. For the

purposes of appellate review this Court operates under a slightly different standard as was clarified in *Whitsey* II, and aptly stated in *United States v. Mathews*, 803 F.2d 325, 330 (7th Cir.1986):

> ... *Batson* reminds us that " 'a finding of intentional discrimination is a finding of a fact,' entitled to appropriate deference by a reviewing court," and that, "[s]ince the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Id.* [106 S.Ct.] at 1724 n. 21. Thus, we may only reverse the trial judge's determination that the prosecution's peremptory challenges were not motivated by intentional discrimination if that determination is *clearly erroneous.* [Citations omitted.] [Emphasis added.]

■ Applying these principles to the facts herein, we conclude that the trial court was not clearly erroneous in its findings. Each reason given by the prosecution for the exercise of their peremptory challenges on the six black venirepersons were related if not to the facts of the case, the legal issues that were involved. Three prospective jurors expressed viewpoints indicating an opposition to the infliction of the death penalty: Mansfield Nelson, Wilburn Gibson and Pearlie Mae Keller. Jennie Hensley had a definite propensity to favor a vote on the special issues submitted at the punishment stage which would result in the assessment of a life sentence, rather than death. Nan Marie Roque did positively represent both to the trial court and the prosecutor the view that she was not satisfied with the statutory scheme of the capital murder section of the penal code in that it gave preferential treatment to police officer, and she had difficulty with the State's burden of proof. Finally, Gussie Mae Jones expressed serious problems with the prospect of possible sequestration of the juror in the event she was on the jury. All of the race-neutral reasons put forward by the State's attorney at the *Batson* hearing were substantiated by the initial voir dire.

As to each black venireperson stricken by the prosecution the appellant claims that there was some form of disparate examination, and that most of the voir dire questions as to these individuals was calculated to evoke a desired response in order to disqualify these persons. For example, appellant complains that when questioning Jones, the prosecutor unfairly honed in on the sequestration issue and had not done so with other members of the panel. The record demonstrates to the contrary. At least six other venirepersons were voir dired in reference to sequestration, and one indicated that a problem existed and was excused. There can be no question that once a venireperson informed the trial court of a reservation concerning the death penalty, it became the focus of the prosecutors voir dire. We cannot believe that this was to be proscribed by the dictates of *Batson,* supra. As this Court stated in numerous cases:

> The right to be represented by counsel, guaranteed by Article 1, Section 10 of the Texas Constitution, encompasses the right of counsel to question the members of the jury panel in order to intelligently exercise his peremptory challenges. *Mathis v. State,* 167 Tex.Cr.R. 627, 322 S.W.2d 629 (1959); *De La Rosa v. State,* 414 S.W.2d 668 (Tex.Cr.App.1967); *Burkett v. State,* 516 S.W.2d 147 (Tex.Cr.App. 1974); *Hernandez v. State,* 508 S.W.2d 853 (Tex.Cr.App.1974); *Abron v. State,* 523 S.W.2d 405 (Tex.Cr.App.1975)....

*Ratliff v. State,* 690 S.W.2d 597, 599 (Tex. Cr.App.1985).

Certainly it cannot be disputed that the prosecution, like the defense has the right to ask appropriate questions to enable it to properly and intelligently exercise its peremptory challenge. It may focus its attention in its questioning on any area which will be helpful and assist in the exercise of such choices; so long as it is not done in a disparate manner. In the case *sub judice,* appellant does not direct us to anywhere in the record where the prosecution has acted in such inappropriate practice. No where was it demonstrated that members of other races who were members of the jury panel were not questioned on the death penalty, when they expressed such qualms. Appellant only makes general allegations as to disparate treatment. This is insufficient to sustain his burden of persuasion. Obviously, appellant cannot contend there was a lack of meaningful questioning in reference to any of the challenged jurors as the record affirmatively indicates to the contrary. Further, it has not been shown that a single challenged juror was excluded by the State based upon a group basis not shown to be applicable to the specific potential juror; such theory simply is irrelevant to this cause.

We conclude that the trial court properly found that the State sustained its burden of going forward with race-neutral reasons for expending its peremptory challenges on black venirepersons. Appellant, at the Batson hearing, presented the testimony of several local defense attorneys who related that they were unaware of blacks being on any jury which they tried in Harris County, but could not speak as to all trials. No other evidence was presented as to establish purposeful discrimination. We cannot say that the trial court was clearly erroneous based upon the record before us. Therefore the findings of facts and conclusions of law filed by the trial court will be sustained.

Consequently, the judgment of conviction is affirmed.

McCORMICK, P.J., and CLINTON and WHITE, JJ., concur in the result.