**Marco Le'Nard BRODEN a/k/a Marco Lenard Borden, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 07–95–0092–CR.

Court of Appeals of Texas, Amarillo.

May 21, 1996.

Law Office of Terry Yates, Terry Yates, Houston, for appellant.

Harris County District Attorney, John B. Holmes, Jr., Kimberly Aperauch Stelter, Lance Long, Houston, for appellee.

Before DODSON, BOYD and QUINN, JJ.

QUINN, Justice.

Indicted for the offense of aggravated robbery, Marco Le'Nard Broden, a/k/a, Marco Lenard Borden, appellant, was found guilty and sentenced to life imprisonment by a jury. Through four points of error, he asks whether the court erred in denying his *Batson*[1] challenge, in permitting the State to impeach him via a prior inconsistent statement, in entering judgment given the purported factual insufficiency of the record, and in "making an affirmative finding of a deadly weapon." We answer no to the first three and yes to the last.

1. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct.

### Background

The prosecution arose from an incident at a car wash. As Kevin Painter finished detailing his vehicle, appellant and another black male, Glenn Green, ran towards him. Green stopped immediately before Painter and pressed his chest against that of his eventual victim. Appellant, on the other hand, stopped on the passenger side of the vehicle and aimed a .45 caliber handgun at Painter's head. Green demanded Painter's car keys under penalty of death. Painter initially acquiesced but then grabbed the handgun Green held and began to struggle with him. Green directed appellant to shoot. He did, twice, and the two bullets discharged raced passed Painter's head.

Green eventually pulled free enough to discharge his own weapon. His bullet struck Painter who fell to one knee. Appellant and Green then entered the vehicle and drove away. Painter, severely wounded, walked to a nearby fast food restaurant to seek help. The police soon arrived and began questioning him. Before they could complete their interrogation, Painter was transported to the hospital.

Appellant was later apprehended while using Painter's car. The grand jury indicted him for aggravated robbery, and a jury of his peers subsequently convicted him.

### Point of Error One

Appellant initially contends that trial court erred in denying his challenge to the jury array because the State allegedly considered race in peremptorily striking three, of the six, black jurors from the panel. The jurors in question were numbers six, ten and seventeen. We disagree with the suggestion that the trial court erred and overrule point one.

### Applicable Law

A *Batson* claim requires the trial court to determine whether the litigant intentionally discriminated against a prospective juror because of his race. *Hernandez v. New York,* 500 U.S. 352, 359–60, 111 S.Ct. 1859, 1866–67, 114 L.Ed.2d 395, 406 (1991); *see Chambers v. State,* 866 S.W.2d 9, 23

1712, 90 L.Ed.2d 69 (1986).

(Tex.Crim.App.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1871, 128 L.Ed.2d 491 (1994) (noting that the defendant has the burden to prove *purposeful* discrimination); *Dewberry v. State,* 776 S.W.2d 589, 591 n. 2 (Tex.Crim. App.1989) (recognizing that despite the rhetoric concerning the establishment of a "prima facie case," the ultimate question is whether the litigant intentionally discriminated). That inquiry is inherently factual. *Salinas v. State,* 888 S.W.2d 93, 98 (Tex.App.—Corpus Christi 1994, pet. ref'd), *cert. denied,* — U.S. ——, 116 S.Ct. 85, 133 L.Ed.2d 42 (1995); *accord Vargas v. State,* 838 S.W.2d 552, 554 (Tex.Crim.App.1992) (discussing the factual nature of these inquiries). Furthermore, to flesh-out the requisite facts, the court conducts an adversarial, evidentiary hearing. *Lott v. City of Fort Worth,* 840 S.W.2d 146, 149 (Tex.App.—Fort Worth 1992, no writ); *Shields v. State,* 820 S.W.2d 831, 832 (Tex.App.—Waco 1991, no pet.).

■ Once the trial court acts, we are not free to consider its ruling *de novo. Vargas v. State,* 838 S.W.2d at 554. Quite the contrary, the court's decision is entitled to the deference, like most every other decision it makes. *See Salinas v. State,* 888 S.W.2d at 98 (holding that the finding of no discrimination is subject to review under deferential standards). More importantly, we may not overrule it unless the actual or implicit finding of no discrimination is clearly wrong. *Vargas v. State,* 838 S.W.2d at 554 (adopting the "clear error" standard of review for discrimination claims arising in the criminal setting); *Hernandez v. New York,* 500 U.S. at 366–70, 111 S.Ct. at 1869–71, 114 L.Ed.2d at 410–12 (also discussing the deference to be accorded). To this end, we must construe the record in a manner favoring the decision and forego the invitation to reweigh the evidence or resolve credibility disputes. *Vargas v. State,* 838 S.W.2d at 553–54. And, if the evidence is of a sufficient quantum so as to render the court's decision plausible or to

dispel a firm and definite conviction that a mistake occurred, the ruling must stand. *Doby v. State,* 910 S.W.2d 79, 80–81 (Tex. App.—Corpus Christi 1995, pet. ref'd).

■ In effect, the standard of review frees us from having to undertake the cumbersome procedural route journeyed by trial courts. *Dewberry v. State,* 776 S.W.2d at 591 n. 2. Unlike them, we do not travel through the land of shifting burdens.[2] *Id.; Spears v. State,* 902 S.W.2d 512, 515 (Tex.App.—Houston [1st Dist.] 1994, no pet.) (noting that the preliminary issue of whether the claimant established a prima facie case becomes moot when his opponent "articulates his reasons for the challenged peremptory strike[s]"). Instead, our duty is to simply decide whether the record evidence supports the trial court's ruling. *Dewberry v. State,* 776 S.W.2d at 591 n. 2 (stating that the question of whether one has established a prima facie case is normally not the concern of the appellate court).

*Application of Law to Case at Hand*

*a. Juror Six*

■ According to the record, the State struck juror six because of his protestations of unfair treatment "by the Sheriff [sic] Department, that it might affect his verdict[,] and that . . . he couldn't trust the police, you couldn't trust anyone anymore. . . . Also [he] was concerned about child care and whether he could get home in time [on] certain days. . . ." We note that a juror's prior unpleasant experience with individuals involved in law enforcement is a race neutral explanation. *Hawkins v. State,* 793 S.W.2d 291, 293 (Tex.App.—Dallas 1990, pet. ref'd.) (juror that had a bad experience with police officers); *Hernandez v. State,* 808 S.W.2d 536, 544 (Tex.App.—Waco 1991, no pet.) (unpleasant experience with the police is a race neutral reason to peremptorily challenge a prospective juror). So too are a prospective

2. In this land, reminiscent of that journeyed by practitioners in the field of employment discrimination, the claimant first establishes a prima facie case of discrimination which triggers his opponent's burden to come forward with race neutral explanations for his acts, which, in turn, triggers the claimant's burden to discredit those explanations. *Dewberry v. State,* 776 S.W.2d 589, 591 n. 2 (Tex.Crim.App.1989); *accord Purkett v. Elem,* — U.S. ——, 115 S.Ct. 1769, 1770–71, 131 L.Ed.2d 834, 838–39 (1995) (describing the shifting burdens); *Harris v. State,* 827 S.W.2d 949, 955 (Tex.Crim.App.), *cert. denied,* 506 U.S. 942, 113 S.Ct. 381, 121 L.Ed.2d 292 (1992), *quoting Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

juror's inability to set aside bias and his concern for the care and welfare of his children race neutral grounds. *Williams v. State*, 804 S.W.2d 95, 99 (Tex.Crim.App.), *cert. denied*, 501 U.S. 1239, 111 S.Ct. 2875, 115 L.Ed.2d 1038 (1991) (wherein the prosecutor voiced concern about the juror's three minor children as a basis for striking the juror).

Here, Juror six, recounted his unpleasant experience with the local Sheriff's Department. Furthermore, the event had "affected [him] for quite awhile." When asked by the State if it would influence his verdict, he answered, "[h]onestly[,] I couldn't say." A like response was given appellant's counsel when he interrogated the venire member. Additionally, in response to the court's inquiry about scheduling conflicts, juror six did state that he had a problem on one of the two days set aside for trial. "... I work a short day because my wife works at night. Goes [sic] to work in the afternoon, work [sic] there is at night, so I got kids, young kids." [3]

Thus, the record illustrated factual basis for the State against juror six. Given the juror's admitted bias, his discomfort with law enforcement personnel, his concern for his children, and the race neutral grounds propounded by the State for striking him, the trial court's implicit finding of no racial discrimination was not clearly erroneous.

### b. Juror Ten

◼ According to the record, the State struck juror ten because "he had an answer for every question," he purportedly had "training in memory," "he appeared to be the kind of person [who] has comments to say about everything," and its worry about potential juror confusion. On their face, each of these reasons were free of racial taint. Moreover, it appeared that at least one juror commented upon the various psychology classes taken during four years in the military, and neither party denied that the individual making the comment was juror ten. Additionally, the individual *sitting next to juror ten* did speak about her involvement with "false memory syndrome" and the ability to hypnotize someone into believing something.[4]

Additionally, the record did reveal that juror ten entered into a colloquy with the prosecutor about racism and its potential "mitigating" effect on the culpability of one's actions. He was noted to have "sighed," stated that he had "never been a prejudice person," given a description of his ancestry, indicated that he had never experienced racism until coming to Texas, and indicated his agreement that society was far from perfect.

◼ In analyzing the above excerpts, we agree with the State's observation that "[w]hile all of [juror ten's] discussions might not be attributed to him in the record, it appears ... that he was very talkative and did like to give detailed answers." Thus, the record supports the suggestion that juror ten had training concerning the mechanics of the human mind, and one could reasonably infer from his comments that he was opinionated. That others may not have removed him for these reasons is of no consequence. Indeed, the litigant, whether the State or the defendant, has the prerogative to choose as it will, whether sensible or not, so long as invidious discrimination does not motivate the decision. *See Tompkins v. State*, 774 S.W.2d 195, 205 (Tex.Crim.App.1987), *aff'd*, 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989) (upholding a strike simply because the juror was a mailman and noting that it was not the "office" of the reviewing court to judge the prosecutor's credibility). In sum, the trial court did not clearly err in rejecting appellant's motion *vis-a-vis* juror ten.

### c. Juror Seventeen

◼ Finally, the State challenged juror seventeen because she had no opinion upon a

---

**3.** The record fails to specify the identity of the jurors answering the particular questions. However, that juror six made the comment cited was illustrated by the court's later reference to him and the comment.

**4.** Given the undoubted spatial proximity of the juror who spoke of "false memory syndrome,"

that is, juror eleven, to juror ten, it could be that the State mistakenly attributed the utterances of the former to the latter. Yet, even if so, confusing the comments of various jurors is not, in and of itself, indicative of racial animus. Quite the contrary, it simply illustrates confusion.

question asked of her. Specifically, the prosecutor queried whether

> In your mind is there any difference in intent on [sic] someone who causes serious damage to someone and then miraculously lives and then the person that just doesn't live? Is there anymore danger to society from the person that did either one? Their intent in both cases was to kill or really hurt somebody.

When asked if she had an opinion on the matter, juror seventeen said "no."

Striking someone because he had no opinion about a matter may seem frivolous. So too may one see it as incongruous when another juror was struck because he was opinionated. Nevertheless, the reason propounded is race neutral, and the State is free to exercise its preemptory challenges for any reason, save an invidiously discriminatory one. We also note that at least three black individuals remained in the jury pool and that at least two anglo members were removed for reasons similar to those used to remove a black juror, though not juror seventeen. These indicia do not readily lend themselves to the conclusion that the State's actions were racially stimulated. Additionally, the cold record before us further demands that we defer to the trial court's ability to recall the demeanor of the juror in making its decision. When all these factors are considered, we are again compelled to hold that the court's action was not clearly erroneous.[5]

### Point of Error Two

■ In his second point of error, appellant alleges the trial judge erred in allowing the State to call a rebuttal witness to impeach appellant via a prior oral inconsistent statement. The error arose, according to the appellant, when the State failed to lay the predicate demanded by Rule 612(a) of the Texas Rules of Criminal Evidence.

5. It may well be that one can establish a prima facie case of discrimination by proffering nothing more than the race of the excluded juror. Yet, that does not automatically bind the trial court to hold that the exclusion was racially motivated. Again, the judge sits as a fact finder with the powers of a fact finder. Thus, he is free to believe the race neutral reasons espoused by the litigant or not to believe them. He is free to consider intangibles which do not appear in an

### Applicable Law

■ Rule 612 directs that before a witness may be impeached by extrinsic evidence of a prior inconsistent statement he must be informed of the statement's content, the time and place at which it was made, and the person to whom it was uttered. *Tex.R.Crim. Evid.* 612(a); *McGary v. State,* 750 S.W.2d 782, 786 (Tex.Crim.App.1988). So too must the witness be afforded opportunity to explain or deny the statement. *Id.* If the witness "unequivocally" admits that he made the prior inconsistent statement, extrinsic evidence of the statement is inadmissible. *Id.* If he equivocates, or qualifies his answer, however, it is admissible. *McGary v. State,* 750 S.W.2d at 786 n. 3.

### Application of Law to Circumstances at Hand

On cross-examination Appellant testified to the following:

Q. ... *When you were arrested* leaving the *Boomerang Club they* asked you where you got the car, right?

A. Yes, sir.

Q. And you saw one of *those* officer's testify here, right?

A. Yes, sir.

Q. And you told *him* that *you got the car from a Nick Daniels at a park,* right?

A. *No, sir. I don't recall that.*

Q. You don't—did you say it?

A. I told them where I got the car from but I did not say nothing about the park. Three officers came to me at different times.

Q. So is it your testimony that you never told any officer that you got the car from a Nick Daniels at a park?

appellate record, such as demeanor, expression, or voice tone. We can do neither given the deferential standard of review. And, to conclude, as a matter of law, that race was a motivating factor simply because the juror was black or hispanic or anglo seems more likely to perpetuate racism than to combat it. Indeed, such a conclusion presumptively assigns to all involved objectionable racial tendencies regardless of the facts.

A. I might not remember the name that I told him.

Q. Well, you just told the jury you didn't get it at a park, you got it at a Popeye's?

A. Yes, sir.

Q. So are you saying now that you did not get it from a Nick Daniels at a park?

A. I did get the car from him.

Q. I just want you to answer my question, sir. *You said you did not get it from a Nick Daniels at a park.*

A. I stated I told them where I got the car from.

Q. I want you to answer my question. *Did you get the car from a Nick Daniels at the park?*

A. *I don't know a Nick Daniels.*

Q. Did you tell *an officer that you got the car from a Nick Daniels?*

A. *I don't recall that, sir.*

    *    *    *    *    *    *

Q. *You don't remember telling another officer that you were going to bring it back to Westwood Mall?*

A. *No, sir, I don't remember that.*

Q. So you did not say that either?

A. *No, sir.*

(Emphasis added). Thereafter, the State called Officer Sean Palin to impeach appellant. When asked if he had conversed with appellant the night of the arrest, Palin answered "[y]es." When asked "who did he [appellant] tell you he had gotten the car from," Palin replied, "[h]e said he borrowed it from a Nick Daniels." When asked whether appellant told him the location at which he was to return the car, Palin eventually said, "he was going to take it back to the West Side Mall."

From the foregoing, we see that appellant was told the contents of the particular statements, that is, from whom he obtained the car and to where he was to return it, the time at which it was made, that is, at his arrest, the place at which it was uttered, while leaving the Boomerang Club, and to whom it was made, that is, to one of the arresting officers who testified. The State also provided him with opportunity to admit, explain, or deny the prior statement, and his responses, to say the least, were not unequivocal. Though not a picture of grand artistry, the questions asked of appellant, nonetheless, satisfied the requirements of Rule 612(a). Thus, the court did not err in allowing the State to impeach him.

### *Point of Error Three*

■ Next, appellant attacks the factual sufficiency of the evidence underlying his conviction. Specifically, he contends that the evidence regarding his identification as the perpetrator was deficient.[6]

### *Standard of Review*

■ In determining whether the evidence is legally sufficient, we must ask whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *King v. State*, 895 S.W.2d 701, 703 (Tex.Crim.App.1995). If he or she could, then the evidence underlying the conviction is legally sufficient. However, in addressing questions of factual sufficiency, we put aside the requirement that the evidence be viewed through a prism of light favorable to the State. Instead, our task is to peruse the entire record and decide whether the overwhelming weight of the evidence so contradicts the verdict as to make that verdict clearly wrong or unjust. *Clewis v. State*, 922 S.W.2d 126 (Tex.Crim.App.1996).

■ Finally, under both standards, the fact finder may still reasonably infer facts from the evidence before it, credit the witnesses it cares to, disbelieve any or all of the testimony proffered, and weigh the evidence in the manner it chooses. *Depauw v. State*,

---

6. In making his argument, appellant portends that the victim's identification of him was unreasonably suggestive. However, his brief contains no point of error upon this ground. Thus, we are not called upon to determine whether his identification should have been excluded from evidence.

658 S.W.2d 628, 633–34 (Tex.App.—Amarillo 1983, pet. ref'd). These are the prerogatives of the fact finder as opposed to the reviewing court. We cannot usurp them.

### Application of Standard to Record Evidence

From the witness stand, Painter recounted the events which transpired and appellant's involvement in same. When asked whether the individual who fired the first bullet at him was present, the witness identified appellant. He further recalled, for the jury, how he concentrated on appellant's face as the latter aimed the .45 calibre handgun at his head. So too did Painter describe his identification of appellant from six photographs shown him by a detective while in the hospital and at a later hearing. He told the jury that "it was no question in [his] mind [that appellant] was the man" who stood on the other side of the car and shot at him. Appellant's "face and that gun ... [were] unmistakable."

On cross-examination, appellant's counsel sought to discredit the identification. Painter admitted that he did not recall what appellant wore at the time, that he did not give the officers a detailed description of appellant at the crime scene, and that when first presented with the photos he pointed at another picture before picking appellant's.

In turn, appellant testified that he was not at the car wash but at a park.[7] After leaving the park, he walked a girl home and then went home himself. Effort was also made to discredit Painter's identification of him by recounting an auto accident which allegedly restricted his movements.

Admittedly, the record held conflicting evidence on the issue of identification. Yet, as previously mentioned, the jury was free to credit whichever witness it chose to credit. And, it apparently believed Painter's identification of appellant. Given that Painter's testimony supported the jury's decision, we cannot say that the weight of the opposing evidence rendered the decision manifestly unjust or wrong. So, point of error three is also overruled.

### Point of Error Four

In his last point, appellant contends that the "court erred by making an affirmative finding of a deadly weapon." Allegedly, the jury, not the trial court, was required to specifically find that appellant used a deadly weapon when the charge enabled the jury to convict him as either a principal or party. We agree and sustain the point.

### Applicable Law

Before a judgment may reflect that a deadly weapon was used or exhibited by the defendant in committing the offense, the fact finder must conclude that a deadly weapon was so used.[8] This requirement is generally met if the defendant is found guilty "as charged in the indictment" and the indictment alleges the use or exhibition of a deadly weapon, or if the defendant is found guilty "as charged in the indictment" and the indictment alleges the use of a weapon considered deadly *per se*, or the jury responds affirmatively to a special issue on the subject. *Davis v. State*, 897 S.W.2d 791, 793 (Tex. Crim.App.1995); *Polk v. State*, 693 S.W.2d 391, 394–95 (Tex.Crim.App.1985).

Yet, when the jury charge authorizes the jury to convict the defendant as either a principal or a party, the deadly weapon finding must take on a more definitive character. For instance, in *Flores v. State*, 690 S.W.2d 281 (Tex.Crim.App.1985), the State indicted Flores for intentionally causing the death of an individual " 'by shooting ... [his victim] with a *handgun.*' " *Id.* at 282–83 (emphasis

---

7. This representation was corroborated by appellant's brother. Furthermore, the time was approximately 8:30 or 9:00 p.m. when appellant left. However, the witness admitted that he did not have a watch at the time.

8. If a jury was called upon to try both the defendant's guilt and punishment, then the jury must make the finding. *Davis v. State*, 897 S.W.2d 791, 793 (Tex.Crim.App.1995). However, if the court acts as the trier of fact during either phase of the trial, then it may issue the requisite finding. *Flores v. State*, 690 S.W.2d 281, 283 (Tex. Crim.App.1985) (holding that the court, when acting as the trier of fact during punishment, may make such a finding even though a jury acted as fact finder during the guilt/innocence phase).

added). Furthermore, the charging instrument said nothing about him acting in any capacity other than a principal. *Id.* at 283. Nevertheless, the court charged the jury that it could find Flores guilty as either a principal or party. *Id.* Thereafter, the jury simply concluded that Flores was guilty " 'as charged in the indictment.' " *Id.*

At first blush, one could assume that the wording of the verdict constituted an affirmative finding of a deadly weapon under *Davis* and *Polk.* Indeed, it stated that the defendant was guilty "as charged in the indictment" and the indictment described the use of a deadly weapon. Yet, the Texas Court of Criminal Appeals holds otherwise. Under the circumstances described, it is "impossible ... to determine which theory the jury used to conclude that the appellant was guilty, individually or as a party, and the trial court [as fact finder in the punishment phase of the trial] did not specify that this appellant used or exhibited a deadly weapon," according to the reviewing court. So, the trial judge was prohibited from affirmatively finding that Flores used a deadly weapon in shooting his victim. *Id.*

Several years later the Court of Criminal Appeals reaffirmed *Flores* through *Reyes v. State,* 741 S.W.2d 414 (Tex.Crim.App.1987). There, the State indicted Reyes as a principal in the murder of Francisco Luna " 'by shooting ... [Luna] with a firearm.' " *Reyes v. State,* 694 S.W.2d 556, 559 (Tex.App.— Corpus Christi 1985), *reformed and affirmed,* 741 S.W.2d 414 (Tex.Crim.App.1987). However, like the situation in *Flores,* the jury was instructed that it could convict Reyes as either a principal or party. *Id.* at 568. Thereafter, the jury returned a verdict of guilty " 'as charged in the indictment.' " But, when the trial court attempted to incorporate a deadly weapons finding into its judgment, the Court of Criminal Appeals again said it could not. Relying upon *Flores* and various other opinions, it ruled that because Reyes could have been found guilty as a party, as opposed to principal, the jury had to specifically find that he, as a party, used or exhibited a deadly weapon. Holding him guilty "as charged in the instrument" did not satisfy the prerequisite. *Reyes v. State,* 741 S.W.2d at 432–33; *accord Terry v. State,* 692 S.W.2d 496 (Tex.Crim.App.1985).

In reaching the decision it did, the *Reyes* court also cited with approval *Polk v. State,* 710 S.W.2d 610 (Tex.App.—Dallas 1986, pet. ref'd). There, the intermediate appellate court also held that a specific finding was necessary when a "party" charge was included in the court's instructions to the jury. *Id.* at 612–13. It was not enough for the jury to merely hold the defendant guilty "as charged in the indictment." *Id.* at 612–13; *accord Pritchett v. State,* 874 S.W.2d 168, 172–73 (Tex.App.—Houston [14th Dist.] 1994, pet. ref'd).

Thus, the law appears quite settled. When the court includes a party charge in its jury instruction, the jury must specifically find that the defendant used or exhibited a deadly weapon or knew that same would be used or exhibited, *Tex.Code Crim.Proc.Ann.* art. 42.12, § 3g(a)(2) (Vernon Supp.1996), before the judgment may reflect the involvement of a deadly weapon. Reference to the indictment when reciting its verdict is not enough, even though the indictment expressly mentions the use of a deadly weapon while saying nothing about the defendant acting as a party.[9]

---

9. The State attempts to avoid this by invoking a recent amendment to article 42.12 of the Texas Code of Criminal Procedure. However, § 3g(a)(2) simply codifies the case law previously discussed. The fact finder must still make an affirmative finding that "the defendant used or exhibited the deadly weapon or *was a party to the offense and knew that a deadly weapon would be used or exhibited.*" *Tex.Code Crim.Proc.Ann.* art. 42.12, § 3g(a)(2) (Vernon Supp.1996) (emphasis added); *Mulanax v. State,* 882 S.W.2d 68, 70–71 (Tex.App.—Houston [14th Dist.] 1994, no pet.). Nor can we agree with the suggestion that a specific finding is unnecessary because "there is no question that appellant used and exhibited a firearm during the aggravated robbery." The party instruction given by the trial court at bar mentioned nothing of a deadly weapon. Thus, the jury did not have to conclude that appellant used a weapon to convict him as a party; quite the contrary; it need only have found that appellant acted "with the intent to promote or assist the commission of the offense ... [and] solicited, encouraged, directed, aided or attempted to aid Glenn Green...."

The logic behind *Flores* and its progeny is questionable. The Court of Criminal Appeals itself recognized in *Polk* that the affirmative finding need not appear in any particular form. Because of that, it permitted the trial judge to enter such a finding in its judgment when the jury convicts a defendant "as charged in the indictment" and the indictment mentions the involvement of a deadly weapon. If the indictment says nothing about the defendant acting as a "party" and the jury convicts "as charged in the indictment," it is senseless to infer that the jury could have meant that he was simply a party. In effect, *Flores* and the other cases discussed above not only ignore the plain and clear language of the verdict but also the *Polk* admonishment that no particular wording is needed. Nevertheless, we are duty bound to follow the law until changed by the legislature or Court of Criminal Appeals, and, at this time, the law is as stated in *Flores*.

### Application of Law Standard to Case at Hand

Here, the indictment charged appellant, as a principal, with aggravated assault while using a deadly weapon. Nothing was said about his acting merely as a party. Yet, the court's instructions entitled the jury to hold him guilty as either a principal or party. Upon deliberating the matter, the jury declared that appellant was guilty "as charged in the indictment." Because the District Attorney did not request a charge on the use of a deadly weapon, the jury made no separate affirmative finding about the weapon's involvement. Under these circumstances, we must hold that the trial judge could not *sua sponte* fill the void by stating in its judgment that appellant used or exhibited a deadly weapon while assaulting Painter. This, however, does not require us to reverse. *Davis v. State*, 897 S.W.2d at 794. We have the authority to reform the decree by redacting prohibited passage. *Id.*

Accordingly, we strike from the judgment reference to appellant's use and exhibition of a deadly weapon and, as reformed, affirm it.