IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-08-00008-CV

 

Cove Terrace Associates, I, Ltd.,

as Successor in Interest to 

CTE Shopping Centers I, Ltd.,

                                                                                    Appellant

 v.

 

Michele McGuire,

                                                                                    Appellee

 

 

 



From the 52nd District
Court

Coryell County, Texas

Trial Court No. CAC-03-34918

 



MEMORANDUM  Opinion



 

This case is a commercial
landlord-tenant dispute.  Michele McGuire d/b/a Michele’s Floral & Gifts
sued her landlord, Cove Terrace Associates I, Ltd. (Cove Terrace) for breach of
contract and constructive eviction after her floral shop suffered water damage. 
Assurance Company of America intervened and asserted a subrogation claim.  Cove
Terrace asserted several affirmative defenses and counterclaimed against
McGuire for breach of the lease.  A jury found in favor of McGuire, and the
trial court denied Cove Terrace’s motion for judgment notwithstanding the
verdict and entered judgment on the verdict.  Raising three issues, Cove
Terrace appeals the trial court’s judgment.

Factual Background

            In 1989, McGuire purchased
the flower shop located at 248 Cove Terrace in the Cove Terrace Shopping Center in Copperas Cove, Texas.  Over the years, she entered into three lease
agreements.  In 1995, she entered into a lease agreement with CTE Shopping
Centers, Ltd. for a term of three years.  Cove Terrace subsequently bought the
shopping center from CTE Shopping Centers, Ltd., and in 1998, McGuire agreed
with Cove Terrace to extend the 1995 lease.  The lease extension agreement
stated that, except for several modifications, the 1995 lease would “remain in
full force and effect” until February 28, 2003.

            On November 29, 2001,
McGuire began to have a problem with water entering her shop.  She immediately called
and reported the problem to Quine & Associates, Inc., Cove Terrace’s agent
and manager of the shopping center.  Over the next few weeks, the parties
attempted to discover the reason for the water intrusion, and McGuire discovered
water in her shop on several more occasions.  On each occasion, Quine &
Associates had Diversified Services perform water extraction and drying
services.

            It was eventually discovered
that a concrete ramp that had recently been constructed for another tenant in
the alleyway behind the shop was the reason for the flooding.  The ramp had
been constructed so that it blocked the back door to the vacant unit adjacent
to McGuire’s shop, and when it rained, the water would flow over the ramp’s
edge like a waterfall and under the door of the adjacent unit.  The water was
then migrating into McGuire’s shop from the adjacent unit.  Upon discovering
this, a piece of metal was put in to divert the water, and a new door was
built, stopping the water intrusion.  No more water migrated into McGuire’s
shop after December 16, 2001.

In January 2002, McGuire began complaining
about mildew and mold in her shop.  At the end of January, Quine &
Associates had Diversified Services treat and seal the floors and install new
carpet in McGuire’s office.  In late February, McGuire discovered additional
mold growing under a cooler.  Diversified Services returned to the shop and
wanted to put down a treatment to kill the mold underneath the cooler floor,
but McGuire would not allow it.  On February 28, McGuire permanently closed the
shop at the Cove Terrace Shopping Center, and sometime between March 1 and
March 3, she found another location that was just around the corner from the
Cove Terrace Shopping Center.

On March 5, McGuire sent a letter
notifying Cove Terrace that she was immediately vacating her unit at the
shopping center because it had become uninhabitable due to the flooding and
resultant mold infestation.  On March 13, Cove Terrace sent a letter to
McGuire, stating that she was in default under the terms of the lease agreement
for failure to pay certain annual billbacks for 2001.  The letter demanded that
McGuire pay the amount by 12:00 p.m. on March 19 and continue thereafter making
monthly payments of rent and other charges as stated in the lease, or Cove
Terrace would notify its attorneys to sue her.  When McGuire did not pay the 2001
billback charges by March 19, Brad Quine, the president of Quine &
Associates, had the locks to her unit changed and had a notice posted on the
door to her unit that the locks were changed because she breached the lease
agreement and that she could get new keys from Quine & Associates when the
terms of her lease had been met.

By March 20, 2002, the date when the
lockout notice was posted on the door, McGuire had already vacated the
premises.  She eventually paid the 2001 billback charges on April 20, but she
testified that she did not pay rent from April 2002 through February 2003.

Procedural Background

McGuire sued Cove Terrace for breach of
contract and constructive eviction.  Assurance Company of America, McGuire’s commercial property-casualty insurer, intervened, asserting its
subrogation claim.  Assurance had paid $16,355.50 for the replacement cost of
the personal property that was damaged by the water; $6,650 for the nine days
that McGuire’s shop had to be closed; $19,759 for the anticipated environmental
remediation expense; $7,581.45 for the balance due on two of the coolers that
had to be left in the unit; and $38,708.75 for lost business and the balance
due to rebuild her business.  Cove Terrace counterclaimed against McGuire for breach
of the lease.

A jury found that Cove Terrace breached the
lease and constructively evicted McGuire and that McGuire was not liable to
Cove Terrace for breach of the lease.  The jury awarded McGuire $12,000 for
economic damages and $20,000 for mental anguish damages.   Accordingly, the
trial court entered judgment in favor of McGuire for the principal sum of
$32,000, plus pre-judgment and post-judgment interest.  The judgment further
ordered that McGuire recover from Cove Terrace $40,000 in attorney’s fees for
services rendered through the trial of the case and conditional appellate attorney’s
fees in the court of appeals and the supreme court.  Cove Terrace then filed a
motion for judgment notwithstanding the verdict, a motion to disregard jury
findings, and a motion for new trial, all of which the trial court denied.

Issue No. 1

            In its first issue, Cove
Terrace contends in part that the trial court erred in denying its motion for
judgment notwithstanding the verdict.  Specifically, Cove Terrace argues that the
jury’s answers to Question No. 1A and B[1]
were immaterial in light of the language of the lease.

A trial court may disregard a jury’s
findings and grant a motion for judgment notwithstanding the verdict only when
a directed verdict would have been proper.  See Tex. R. Civ. P. 301; Fort Bend County Drainage Dist. v.
Sbrusch, 818 S.W.2d 392, 394 (Tex. 1991); see also Prudential Ins. Co.
v. Fin. Review Servs., Inc., 29 S.W.3d 74, 77 (Tex. 2000) (directed verdict
proper only when evidence conclusively establishes right of movant to judgment
or negates right of opponent or evidence is insufficient to raise material fact
issue); Cain v. Pruett, 938 S.W.2d 152, 160 (Tex. App.—Dallas 1996, no
writ) (directed verdict proper when evidence reflects that no other verdict can
be rendered and moving party is entitled to judgment as a matter of law).  A
motion for j.n.o.v. should be granted when the evidence is conclusive and one
party is entitled to recover as a matter of law or when a legal principle
precludes recovery.  Morrell v. Finke, 184 S.W.3d 257, 290 (Tex. App.—Fort Worth 2005, pet. denied); see also United Parcel Serv., Inc. v.
Tasdemiroglu, 25 S.W.3d 914, 916 n.4 (Tex. App.—Houston [14th Dist.] 2000,
pet. denied) (“A court should grant a motion for judgment notwithstanding the
verdict if a legal principle prevents a party from prevailing on its claim.”). 
 

 

Mangum v. Turner, 255 S.W.3d 223, 226 (Tex. App.—Waco
2008, pet. denied).

We apply well-established rules of
contract interpretation in construing the lease between Cove Terrace and
McGuire.  Our primary concern in interpreting the contract is to ascertain the
true intentions of the parties as expressed in the instrument.  Seagull
Energy E & P, Inc. v. Eland Energy, Inc., 207 S.W.3d 342, 345 (Tex. 2006).  If the written instrument is so worded that it can be given a definite or
certain legal meaning, then it is not ambiguous, and we will construe the
contract as a matter of law.  Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983).  Terms are given their plain, ordinary, and generally accepted meaning,
unless the instrument shows the parties used them in a technical or different
sense.  Heritage Res., Inc. v. Nations Bank, 939 S.W.2d 118, 121 (Tex. 1996).  We must examine and consider the entire writing in an effort to harmonize and
give effect to all provisions so that none are rendered meaningless.  J.M.
Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003).  To the
extent of any conflict, specific provisions control over more general ones.  Forbau
v. Aetna Life Ins. Co., 876 S.W.2d 132, 133-34 (Tex. 1994).  

            Article XIV of the lease
agreement between Cove Terrace and McGuire is entitled “NON-LIABILITY FOR
CERTAIN DAMAGES,” and Section 14.1 of the article states:

Landlord and Landlord’s agents and
employees shall not be liable to Tenant for any injury to person or damage to
property caused by the Demised Premises or other portions of the Shopping
Center becoming out of repair or by defect or failure of any structural element
of the Demised Premises or of any equipment, pipes or wiring, or broken glass,
or by the backing up of drains, or by gas, water, steam, electricity or oil
leaking, escaping or flowing into the Demised Premises (except where due to
Landlord’s willful failure to make repairs required to be made by Landlord
hereunder, after the expiration of a reasonable time after written notice to
Landlord of the need for such repairs), nor shall Landlord be liable to Tenant
for any loss or damage that may be occasioned by or through the acts or
omissions of other Tenants of the Shopping Center or any other persons
whomsoever, excepting only duly authorized employees and agents of Landlord.

 

McGuire argues that this section does
not preclude her recovery because it only applies when the injury or damage is
caused by the leased premises or other portions of the shopping center
“becoming out of repair,” and her recovery was not based on something that
“became out of repair.”  We disagree.  After removing the inapplicable language,
Section 14.1 states:  “Landlord . . . shall not be liable to Tenant for any
injury to person or damage to property caused . . . by . . . water . . .
flowing into the Demised Premises (except where due to Landlord’s willful
failure to make repairs required to be made by Landlord . . . ) . . . .”[2] 
The plain language of Section 14.1 applies to the undisputed facts in this
case, and, under Section 14.1, Cove Terrace is not liable to McGuire for “any injury
to person or damage to property” caused by the water that flowed into her shop. 
Therefore, Cove Terrace is entitled to judgment as a matter of law because the
lease precludes McGuire’s recovery, and the trial court erred in denying its
motion for judgment notwithstanding the verdict.  We sustain Cove Terrace’s
first issue.

Issue No. 2

            In its second issue, Cove
Terrace contends that the trial court erred in awarding McGuire mental anguish
damages on her constructive eviction claim.  For the same reason we sustained Cove
Terrace’s first issue, we also sustain its second issue.

 

Issue No. 3

            In its third issue, Cove
Terrace argues that McGuire’s breach was established as a matter of law,
contrary to the jury’s answers to Question Nos. 4 and 6 of the jury charge,[3]
and that the trial court erred in failing to award it damages on its
counterclaim for breach of the lease.  Cove Terrace argues in the alternative
that the trial court should have granted a new trial because the jury’s answers
to Question Nos. 4 and 6 are against the great weight and preponderance of the
evidence.

When the party that had the burden of
proof at trial complains on appeal of the legal insufficiency of an adverse
finding, that party must demonstrate that the evidence establishes
conclusively, i.e., as a matter of law, all vital facts in support of
the finding sought.  Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001).  Consistent with City of Keller v. Wilson, we first search the record
for evidence favorable to the adverse finding, disregarding all contrary
evidence unless a reasonable factfinder could not.  One Ford Mustang v.
State, 231 S.W.3d 445, 449 (Tex. App.—Waco 2007, no pet.) (citing City
of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005); Dallas County
Constable v. Garden City Boxing Club, Inc., 219 S.W.3d 613, 616 (Tex.
App.—Dallas 2007, no pet.); Sellers v. Foster, 199 S.W.3d 385, 392 (Tex.
App.—Fort Worth 2006, no pet.)).  If we find no evidence supporting the
finding, we then determine whether the contrary was established as a matter of
law.  Id.

            The lease provides that it
was to terminate on February 28, 2003, and, until that time, McGuire was
required to pay monthly rent and other monthly charges for common area
maintenance, taxes escrow, and insurance escrow.  At trial, Cove Terrace’s
evidence that McGuire had not paid $13,472 was not disputed.  The lease
agreement further states that McGuire shall be deemed to have defaulted under
the lease if she “fail[s] to pay any installment of rent or any other
obligations hereunder involving the payment of money and such failure shall
continue for a period of five days after the date due.”

            McGuire admitted at trial
that she did not pay rent and other fees from April 2002 through February 2003,
but she argues in her brief that her failure to pay rent was excused because
the jury determined that Cove Terrace constructively evicted her.  However, as
explained above, under Section 14.1 of the lease agreement, Cove Terrace is not
liable to McGuire for any injury to person or damage to property caused by
water flowing into her unit, and it only had a duty to repair the foundation,
exterior walls, and roof of the unit.  Thus, Cove Terrace could not have
constructively evicted McGuire by refusing to remedy the damages of which she
complained.

Cove Terrace established McGuire’s
breach of the lease and damages as a matter of law; therefore, we sustain its
third issue.  The court did not make a finding as to Cove Terrace’s reasonable
and necessary attorney’s fees; therefore, we remand that issue to the trial
court for its determination.

 

 

Conclusion

            Having sustained Cove Terrace’s
first two issues, we reverse and render judgment in part that McGuire take
nothing from Cove Terrace.  On Cove Terrace’s third issue, we reverse the trial
court’s judgment, render judgment that it recover $13,472 from McGuire, and
remand the cause to the trial court for its consideration of Cove Terrace’s
claim for attorney’s fees on its counterclaim.

 

REX D. DAVIS

Justice

 

Before
Chief Justice Gray,

Justice Reyna, and

Justice Davis

Reversed
and rendered in part; reversed and remanded in part

Opinion
delivered and filed October 14, 2009

[CV06]

 









[1] Question No. 1A and B of the jury
charge ask whether CTE Shopping Centers, Ltd., as landlord, failed to comply
with its agreement with McGuire by failing to provide peaceful and quiet
possession and failed to operate, manage, and maintain the common area adjacent
to McGuire’s unit.





[2] Section 8.1 provides that the landlord
has a duty to make repairs only to the unit’s foundation, exterior walls, and
roof.





[3] Question No. 4 of the jury charge asks
whether McGuire failed to comply with the lease agreement by failing to pay
rent, including additional rent for common area maintenance, property taxes,
and insurance, from April 1, 2002, through February 28, 2003.  Question No. 6
of the jury charge asks what sum of money would fairly and reasonably
compensate CTE Shopping Centers, Ltd., for its damages caused by such a breach
by McGuire.







          A       Yes.

. . .
 
          Q       Sergeant Vanek, when you had the defendant there on the ground
and his right arm was stiffened up and you were trying to put the
cuff on it, and I believe you testified that Officer Hudson had the
left arm and may have gotten the cuff on it, the defendant made a
statement.

          A       Yes, he did.
 
          Q       And what did he tell you?
 
          A       He said, "Okay, I give up. I'll let you cuff me now."

Sergeant Vanek - Cross Examination by Marks
 
          Q       Now, within the context of [your written report], you have made a
very simple statement, I believe -- and you correct me if I'm wrong
-- that the defendant simply resisted to the extent -- why don't you
refer to your report? You say that he resisted -- he resisted --
 
          A       Okay. Said "He tried to break from me and resisted to the degree
that myself and Officer Hudson had to force him to the ground to
finally be able to restrain him enough to place the cuffs on him."

. . .
 
          Q       And that was in response to his raising his arm or pulling his arm
away from you?
 
          A       That was not the -- I did not attempt to force him to the ground to
gain control of him. As I had ahold of his right arm and he went to
pull away from me, I put my left arm around his neck. And at that
point, he was in a forward motion, at which time carried myself and
him off of the porch, and we could not maintain our balance and we
fell to the ground.

Deputy Hudson - Direct Examination by State
 
          Q       Do you recall the defendant ever making any moves?
 
          A       At that time, you know, at the time that the sergeant placed his hand
on there and started to turn him towards the wall, the defendant
twisted, swung around, and you know, his elbow came back to the
sergeant like that. And the spinning motion carried him around to
facing me to where his left elbow came towards me. I grabbed for
his left arm, and my hand slipped off his arm at that time. Do you
want me to go on?
 
          Q       Sure. Go right ahead.
 
          A       As he spun around -- the sergeant, with his hand on his right bicep,
you know -- spun around -- the sergeant reached around him to get
control of him. Like I say, I was over here. My hand slipped off
his arm, this spinning motion carried him off the porch, and they
stumbled at this time, falling towards the ground.
 
                    Well, I was just right in behind him, reaching for that left arm that
I had lost control of. They fell to the ground with the sergeant
basically on top of the defendant, you know, and --

. . .
 
          Q       Could you see any reason for this action of the defendant, his
twisting and pulling?

. . .
 
          A       Well, the defendant apparently just did not want to be arrested and
was trying to, you know, do whatever he could to break free and
prevent us from handcuffing him.

. . .
 
          Q       As far as the, the action that the defendant took right after being
told he was going to be handcuffed, how would you characterize his
move?
 
          A       Well, I, I would call it a rather violent backward swing, you know,
to maybe knock the sergeant's hand loose or whatever.

. . .
 
          Q       After going to the ground with the defendant, you were working
with his left arm?
 
          A       Yes. This is more or less as they fell to the ground, I was right
behind, grabbed his left arm with my right hand, reached back,
pulled my cuff, pulled his arm around and cuffed it. This all
happened probably in 10 seconds, once the initial contact was made,
you know, and the sergeant said, "You are under arrest," you
know. This whole scuffle probably took 10 seconds, maximum.

. . .
 
          Q       From what you saw out there, who caused the defendant and
Sergeant Vanek to go off the porch?
 
          A       Well, the defendant caused it, himself, by his violent reaction and
twisting motion, his resisting motion.

Deputy Hudson - Cross Examination by Marks
 
          Q       Now, did you not testify that Mr. Vanek took the defendant's arm
and spun him around?
 
          A       No, sir. I believe the spinning motion was caused by the defendant,
himself, in his violent motion back with his elbow like this to try to
jerk, I would say trying to jerk free from the sergeant's grasp, you
know. The defendant was responsible for the violent twisting
motion that we were talking about.

SUFFICIENCY OF THE EVIDENCE
          In point one, Marks complains that the State's evidence was insufficient to support a
conviction of resisting arrest. Evidence will sustain a conviction if, viewing it in the light most
favorable to the verdict, any rational trier of fact could have found the essential elements of the
crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781,
2788-89, 61 L.Ed.2d 560 (1979); Turro v. State, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993). 
Under the Jackson standard, we do not position ourselves as a thirteenth juror in assessing the
evidence; rather, we position ourselves as a final, due-process safeguard ensuring only the
rationality of the factfinder. Moreno v. State, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). We
have only the discretion to determine if any rational trier of fact, considering the evidence admitted
at trial, could have found the essential elements of the offense beyond a reasonable doubt. Id. We
do not make our own myopic determination of guilt from reading the cold record and do not
disregard, realign, or weigh evidence. Id. 
          Marks contends that there is no evidence that he used "force against the peace officer," an
essential element of resisting arrest. Tex. Penal Code Ann. § 38.03(a) (Vernon 1994). Section
38.03(a) of the Penal Code provides that:
          (a) A person commits an offense if he intentionally prevents or obstructs
a person he knows is a peace officer or a person acting in a peace officer's presence
and at his direction from effecting an arrest, search, or transportation of the actor
or another by using force against the peace officer or another.

Id. (emphasis added).
          Marks argues that he did not direct any violence toward the arresting officers. Instead, he
characterizes his actions as "evasive" and describes his struggle with the officers as "an attempted
withdrawal of his arm from Sergeant Vanek's grasp," "an attempt . . . to extricate himself from
Sergeant Vanek's grasp," and "[m]erely pulling away." According to Marks, merely trying to flee
or shake off an officer's detaining grip does not amount to sufficient force directed at a peace
officer to sustain a conviction for resisting arrest. In support of this argument, Marks points to
the decisions in Raymond v. State, 640 S.W.2d 678 (Tex. App.—El Paso 1982, pet. ref'd), and
Leos v. State, 880 S.W.2d 180 (Tex. App.—Corpus Christi 1994, no writ). 
          In Raymond, the court considered whether the act of pulling one's arm out of a peace
officer's grasp constituted "using force against the peace officer." Raymond, 640 S.W.2d at 679. 
The court concluded that it does not, reasoning:
 
The very language of Section 38.03 indicates that the required force must
be directed at the officer or applied to him. Appellant appropriately points to the
Practice Commentary to Section 38.03:
 
One who runs away or makes an effort to shake off the officer's detaining
grip may be guilty of evading arrest under Section 38.04, but he is not
responsible under this section.
 
The Practice Commentary has been cited by the Court of Criminal Appeals with
apparent approval.

. . .
 
Striking an arresting officer's arm away constitutes force directed against
the officer. This is distinctly different from the direction of force employed in
simply pulling one's arm away. There is no danger of injury to the officer in the
latter action.

Id. (citations omitted). 
          In Leos, the defendant crawled on his shoulders and knees with his hands clasped to his
stomach in an attempt to frustrate a peace officer's efforts to shackle him. Leos, 880 S.W.2d at
181. The court held that such an attempt was an insufficient showing of force directed at an
officer to sustain a conviction of resisting arrest. Id. at 184. The court explained:
          The idea of violence directed specifically toward Officer Landrum conflicts
with this image of appellant crawling on his shoulders and knees with his hands
clasped to his stomach. By attempting to crawl away, appellant invited prosecution
for evading arrest. Merely trying to flee does not, however, involve sufficient
force directed at the peace officer to sustain a conviction for resisting arrest. Nor
is the peace officer the object of any force expended in shaking off a detaining grip,
which implies no less force than refusing to submit to the handcuffs. 

Id. (citations omitted). 
          We do not follow the El Paso and Corpus Christi Courts of Appeals' liberal interpretation
of Section 38.03 and the 1973 "Practice Commentary" which followed it. Both courts quote the
following portion of that commentary: "One who runs away or makes an effort to shake off the
officer's detaining grip may be guilty of evading arrest under Section 38.04, but he is not
responsible under this section." Tex. Penal Code Ann. § 38.03 (Seth S. Searcy III & James R.
Patterson, Practice Commentary) (Vernon 1974). We disagree with the courts' decisions in Leos
and Raymond to the extent that they hold that any effort to shake off an officer's detaining grip by
"simply pulling one's arm away" is not sufficient force to sustain a conviction for resisting arrest. 
Leos, 880 S.W.2d at 184; Raymond, 640 S.W.2d at 679. According to the El Paso court in
Raymond, "There is no danger of injury to the officer" in such an action. Raymond, 640 S.W.2d
at 679. The court goes on to say, "Where violence toward the officer is present, Section 38.03
applies, . . . [but,] [w]here violent force is not directed at the arresting officer, the circumstances
are not exigent." Id. 
          Section 38.03 prohibits the use of "force against [a] peace officer or another," not the use
of force toward a peace officer. Tex. Penal Code Ann. § 38.03 (emphasis added). There is a
distinct difference between the two. Webster's defines against as "in opposition to or hostility to,"
and toward as "in the direction of." Merriam-Webster's Collegiate Dictionary 21, 1248
(10th ed. 1993). Thus, pulling one's arm in an attempt to shake off an officer's detaining grip
could amount to force against that officer.



          In Raymond and Leos, both courts chose to omit the topic sentence of the paragraph they
quote from the 1973 Practice Commentary to Section 38.03. Tex. Penal Code Ann. § 38.03
(Practice Commentary). The entire paragraph reads:
          The section applies only to resistance by the use of force. One who runs
away or makes an effort to shake off the officer's detaining grip may be guilty of
evading arrest under Section 38.04, but he is not responsible under this section. 
Unlike prior law, this section covers an arrest or search with and without a
warrant. 
Id. (first emphasis added). In the context of the topic sentence, the paragraph implies that one who
runs away or makes an effort to shake off an officer's detaining grip without the use of force may
be guilty of evading arrest under Section 38.04, but he is not responsible under Section 38.03. 
In an interpretation of Section 38.04, the Court of Criminal Appeals reinforces the distinction
between the use of force and the lack of force when comparing Sections 38.03 and 38.04:
[Section] 38.04 of the Penal Code . . . was obviously designed to apply
where there has been a non-forceful evasion of arrest under the circumstances to
which neither § 38.03 (resisting arrest) nor § 38.07 (escape) is applicable. . . . The
section's intent is to deter flight from arrest by the threat of an additional penalty,
thus discouraging forceful conflicts between the police and suspects.
[Section] 38.04 is general in nature in that it applies to all types of non-forceful evasion of arrest.

Alejos v. State, 555 S.W.2d 444, 449 (Tex. Crim. App. 1977) (emphasis added). Thus, "[o]ne
who runs away or makes an effort to shake off the officer's detaining grip may be guilty of
evading arrest under Section 38.04, [and] not responsible under [Section 38.03]," but only if there
has been a non-forceful evasion of arrest. Tex. Penal Code Ann. § 38.03 (Practice
Commentary). It follows that one who uses force to shake off an officer's detaining grip, whether
by pushing or pulling, may be guilty of resisting arrest under Section 38.03. 
          Notwithstanding the above, the facts of the present case are distinguishable from the facts
in Raymond and Leos. Leos, 880 S.W.2d at 184; Raymond, 640 S.W.2d at 679. The facts of this
case show that when Sergeant Vanek told Marks he was under arrest and "took hold of his right
arm about the wrist area," Marks "stiffened up" and then "jerked back" with a "rather violent
backward swing" of his hand, "com[ing] close to hitting [Sergeant Vanek] in the face." Marks
then "swung his body around in an attempt . . . to face [Sergeant Vanek] head-on" at which time
Sergeant Vanek "grabbed him around the neck to gain better control of him." Marks "was in a
forward motion" and carried Sergeant Vanek and himself off the raised porch and caused them
both to fall to the ground. While on the ground, he held his arm "in a stiff manner underneath
him" to prevent being handcuffed. Finally, Marks said, "Okay, I give up. I'll let you cuff me
now." 
          Such activity goes beyond "simply pulling one's arm away." Raymond, 640 S.W.2d at
679. We conclude that, when viewed in the light most favorable to the verdict, the above evidence
is sufficient to support a conviction for resisting arrest; i.e., any rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt. Jackson, 443 U.S. at 318-19, 99 S.Ct. at 2788-89, 61 L.Ed.2d 560; Turro, 867 S.W.2d at 47. We overrule point one.
BATSON CHALLENGE
          In point two, Marks asserts that the court erred in overruling his Batson challenge
concerning the State's peremptory strike against veniremember Number 6, a black male. Marks
points out that he is black, and that the State exercised two of its three peremptory challenges
against two of the four black veniremembers on a panel of fifteen considered in selecting a jury
of six. According to Marks, the State's exclusion of veniremember Number 6 was "racially
motivated," "discriminatory," and "systematic."



          It is constitutionally impermissible to exercise peremptory strikes on the basis of race. 
Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). To raise a Batson
challenge, the opponent of a peremptory strike must make a prima facie showing of the
proponent's discriminatory use of the strike. Purkett v. Elem, --- U.S. ---, 115 S.Ct. 1769, 1770,
131 L.Ed.2d 834, 839 (1995); Emerson v. State, 851 S.W.2d 269, 273 (Tex. Crim. App. 1993). 
Once the opponent makes a prima facie showing, the proponent of the strike has the burden to
produce a race-neutral explanation for the strike. Purkett, 115 S.Ct. at 1770-71, 131 L.Ed.2d at
839. If a race-neutral explanation is given, the opponent of the strike must prove purposeful racial
discrimination. Id. The burden of persuasion regarding racial motivation never leaves the
opponent of the strike; therefore, the race-neutral explanation given by the proponent of the strike
is not required to be persuasive, but merely facially valid. Id.
          A trial court's finding that peremptory strikes were not racially motivated will be upheld
on appeal so long as the finding is not "clearly erroneous." Whitsey v. State, 796 S.W.2d 707,
726 (Tex. Crim. App. 1989). In determining whether the trial court's decision is "clearly
erroneous," we must review the record and decide if we are left with a firm and definite conviction
that a mistake has been made. Hill v. State, 827 S.W.2d 860, 865 (Tex. Crim. App.) (quoting
Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d
518 (1985)), cert. denied, --- U.S. ---, 113 S.Ct. 297, 121 L.Ed.2d 221 (1992). In doing so, we
view the evidence in the light most favorable to the trial court's rulings. Id. 
          We first consider whether the State met its burden of producing a race-neutral explanation
for its strike against veniremember Number 6.


 A race-neutral explanation is one based on
something other than the race of the venireperson. Chambers v. State, 866 S.W.2d 9, 24 n.16
(Tex. Crim. App. 1993), cert. denied, --- U.S. ---, 114 S.Ct. 1871, 128 L.Ed.2d 491 (1994). "At
this step of the inquiry, the issue is one of facial validity of the prosecutor's explanation. Unless
a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be
deemed race neutral." Id. (quoting Hernandez v. New York, 500 U.S. 352, 360 111 S.Ct. 1859,
1866, 114 L.Ed.2d 395 (1991)). The State indicated that Number 6 was stricken because:
[H]e [did] not understand a lot of my questions. I had to repeat them several times. 
He seemed to be somewhat hesitant in responding to some very crucial questions. 
The most important that comes to mind is[, "I]f an individual were to be arrested
for . . . an assault case or domestic violence and the victim were to want to drop
charges, would that affect their deliberations, as far as a resisting arrest case?["] 
He seemed to be quite hesitant in his responses, he did not give me an unequivocal
response on that. 
 
He also had earrings in each ear. He is a male juror. I personally have an
aversion to jurors, male, that have earrings in each ear. That indicates to me that
they're not mainstream society and that they may be a little bit more liberal than
I would care to have as a juror. 
 
Those are the reasons. Also, he was not married. I noticed that he did
have one . . . child. And for the fact that he did have one child and was not
married, I was concerned that he may have had a rocky marriage and possibly had
problems with his wife and separation or divorce and would be unduly sympathetic
to the defendant in this matter.

Having offered an explanation void of any racially discriminatory intent on its face, the State met
its burden of articulating a race-neutral explanation for the use of a peremptory strike against
veniremember Number 6.
          Next, Marks had to establish purposeful racial discrimination by impeaching or rebutting
the State's explanation; e.g., by showing that the explanation was merely a sham or pretext for
discrimination. Williams v. State, 804 S.W.2d 95, 101-02 (Tex. Crim. App.), cert. denied, 501
U.S. 1239, 111 S.Ct. 2875, 115 L.Ed.2d 1038 (1991). The following types of evidence, among
others, can be used to show a sham or pretext:
          1.       The reasons given are not related to the facts of the case.
 
          2.       There was a lack of questioning to the challenged juror, or a lack of meaningful
questions.
 
          3.       Disparate treatment—persons with the same or similar characteristics as the
challenged juror were not struck.
 
          4.       Disparate examination of members of the venire; e.g., a question designed to
provoke a certain response that is likely to disqualify the juror was asked to black
jurors, but not to white jurors.

. . .

Keeton v. State, 749 S.W.2d 861, 868 (Tex. Crim. App. 1988). 
          In an attempt to show disparate treatment by the State, Marks points out that another
veniremember, Number 1, had many of the same characteristics as Number 6, but was not
stricken. For example, Number 1 had also been employed only eight weeks, was even younger
than Number 6, was also single, and had not one, but two children. The only significant
difference between the two was the fact that Number 1 was a white female and Number 6 was a
black male.

          In response, the State explained:
 
 [T]here is a major difference between [veniremember Number 1] and
[veniremember Number 6], and that is, [Number 6] is male, and [Number 1] is
female. And in this particular case, the defendant is male and . . . the alleged
victim of the defendant's bad acts that will be coming out in punishment, [is]
female. So I was looking for a juror that would possibly be sympathetic to the
State's case in that regard.
           The State asked the following question to the venire panel, prompting what it called a
"hesitant" response from veniremember Number 6:
Would anyone have a problem with an individual being arrested for a particular
offense of which a victim may later decide that they don't want to proceed with the
charges but for the fact that the defendant may have resisted the arrest and
committed a totally different offense from what he was being arrested for, would
anyone feel that the fact that the State was no longer proceeding on the original
reason that he was being arrested for, would anyone find that, in itself, a reason to
find a defendant not guilty of the offense of resisting arrest?
Marks characterized the question as "very verbose, confusing and compound." He later
questioned the prosecutor about it during the Batson hearing:
[DEFENSE]:Other than having you repeat the question, is there something else
that you would point out to the Court to undergird your assertion
that there was hesitancy?
 
          [STATE]:      I would have to say with the number of times that I had to explain to him
the, the question, I would have to indicate to the Court that that, in itself,
would show hesitancy. I felt that the answer was quite clear on its face,
and his hesitancy to answer the question possibly under a guise of not
understanding the question was just a means that he was using to avoid the
question.

          Marks also questioned the State's motivation to strike veniremember Number 6 because
of his earrings:
[DEFENSE]:And, sir, may I ask if you have some expertise in clothing and attire
or any reason that you could specify to the Court that the wearing
of earrings by a male would make him less than fair and impartial
to the State as a juror?
 
[STATE]:I would have to say I do not have a particular expertise where I
could declare myself as an expert, but I would say that the way one
grooms themselves and appears in court, and from my experiences
in life, the way one grooms themselves and presents themselves in
a court of law does have a major bearing of whether or not I would
want them as a witness. If this individual were to be of the color of
Anglo and had . . . two earrings, I, too, would have struck him.
  
          We agree that the State's question to the venire panel about "different offense[s]" was
somewhat confusing. However, considering all of the reasons provided by the State, and viewing
the record as a whole in the light most favorable to the court's ruling, we are not left with a firm
and definite conviction that a mistake has been made. Hill, 827 S.W.2d at 865. Thus, we
conclude that the court's finding that the State's peremptory strike against veniremember Number
6 was race-neutral is not clearly erroneous. Id.
IMPROPER JURY ARGUMENT
          In points three through six, Marks complains that the court erred by overruling his
objections to the State's improper jury argument. Proper jury argument falls within one of the
following categories: (1) a summary of the evidence; (2) a reasonable deduction from the evidence;
(3) an answer to the opponent's argument; or (4) a plea for law enforcement. Harris v. State, 827
S.W.2d 949, 963 (Tex. Crim. App.), cert. denied, --— U.S. --—, 113 S.Ct. 381, 121 L.Ed.2d
292 (1992). In the absence of an objection at trial, improper jury argument is waived. Id. An
exception exists when the prosecutor's argument is so prejudicial that an instruction to disregard
would not have cured the harm. Id. For an improper argument to rise to a level mandating
reversal, the argument must be "extreme or manifestly improper, or inject new and harmful facts
into evidence." Kinnamon v. State, 791 S.W.2d 84, 89 (Tex. Crim. App. 1990) (quoting Mckay
v. State, 707 S.W.2d 23, 36 (Tex. Crim. App. 1985), cert. denied, 479 U.S. 871, 107 S.Ct. 239,
93 L.Ed.2d 164 (1986)), cert. denied, --- U.S. ---, 115 S.Ct. 660, 130 L.Ed.2d 595 (1994).
          In point three, Marks complains that the court erred by overruling his objection to the
State's presentation of unsworn testimony "not encompassed by the court's charge" during its
closing argument. During its closing argument, the State made the following reference to the
Code of Criminal Procedure:
[STATE]:[A]fter [Sergeant Vanek] had told the defendant that he was there to
investigate an offense or a charge of family violence assault, he told
the defendant, "I am going to have to arrest you for family violence
assault."
As you recall, the Penal Code indicates it is the duty and the
authority of peace officers, of persons who the peace officer has probable
cause to believe --
 
          [DEFENSE]: Your Honor, I'm going to object to his arguing out of the Penal Code in
view of the fact that he didn't put the Penal Code in evidence.

          THE COURT:          Overruled.
 
          [STATE]:      The fact -- this is not the Penal Code; this is the Code of Criminal
Procedure. "Persons -- any peace officer may arrest without warrant
persons who the peace officer has --"
 
          [DEFENSE]: Your Honor, I'm going to object to this. It's not in the charge of the Court. 
He's arguing outside of the law of the case.

          THE COURT:          Okay. Overruled.
 
          [STATE]:      "Any peace officer may arrest without warrant persons who the peace
officer has probable cause to believe have committed an assault resulting in
bodily injury to a member of a person's family or household." This is the
duty and the authority of these officers. They were out there to protect this
lady right here. Of course, we'll go into her, her later testimony.
Marks argues that "[a] statement by counsel of what purports to be the law when same is not
contained in the court's charge is improper argument." Cook v. State, 540 S.W.2d 708, 710 (Tex.
Crim. App. 1976). The State argues that the error, if any, was harmless because it "did not
misstate the applicable law and was correct in its application to the facts of the case." Assuming
without deciding that error resulted, we proceed to a harm analysis under Rule 81(b)(2). Tex. R.
App. P. 81(b)(2); Orona v. State, 791 S.W.2d 125, 129-30 (Tex. Crim. App. 1990); Washington
v. State, 822 S.W.2d 110, 117-18 (Tex. App.—Waco 1991), rev'd on other grounds, 856 S.W.2d
184 (Tex. Crim. App. 1993).
          We must reverse for error in overruling an objection to jury argument unless we can say
beyond a reasonable doubt that the error did not contribute to the conviction or the punishment
assessed. Tex. R. App. P. 81(b)(2). Therefore, it becomes necessary to look at the evidence
adduced at both stages of trial. See Allridge v. State, 762 S.W.2d 146, 155 (Tex. Crim. App.
1988), cert. denied, 489 U.S. 1040, 109 S.Ct. 1176, 103 L.Ed.2d 238 (1989). The procedure is:
isolate the error and all its effects, then ask whether a rational trier of fact might have reached a
different result if the error and its effects had not resulted. Harris v. State, 790 S.W.2d 568, 588
(Tex. Crim. App. 1989). In making that determination, we will consider the following six factors: 
(1) the source of the error; (2) the nature of the error; (3) whether or to what extent the error was
emphasized by the state; (4) the probable collateral implications of the error; (5) how much weight
a juror would probably place on the error; and (6) whether declaring the error harmless would
encourage the state to repeat it with impunity. Id. at 587-88. We do not focus on the propriety
of the outcome of the trial, but on the integrity of the process that led to conviction and
punishment. Id. at 587.
          Utilizing the Harris factors, we hold that, when the comments complained of are viewed
in the context of the evidence and the argument of counsel as a whole, the error—if any—was
harmless. See Tex. R. App. P. 81(b)(2). We overrule point three.
          In point four, Marks asserts that the court erred by "allowing the State to vouch for its
witnesses on a non-testimonial basis, asserting that they will lose their livelihood and face prison
if they lie in Court." According to the State, while Marks was on the witness stand, he personally
challenged the veracity of Deputy Hudson by accusing him of "blatantly lying." The following
occurred during the State's cross-examination of Marks:
          [STATE]:      Are you saying that either the deputy was mistaken or he's lying to the
jury?
 
          [MARKS]:     He's blatently [sic] lying.
 
          [STATE]:      He's blatently [sic] lying?
 
          [MARKS]:     Yes, he is.
The State argued the following in its closing argument:
          [STATE]:      To believe the defendant's story in its entirety, you know, especially where
it's going like that, then you have to believe that two peace officers with
almost 35 years of law enforcement experience behind them would come
into this courtroom and intentionally give perjured testimony, a felony
grade offense, where they could be completely stripped of their peace
officer certification, where they could no longer be peace officers. Now,
this is only for a little Class A --
 
          [DEFENSE]: Your Honor, I'm going to object to that as being outside of the evidence.
 
          THE COURT:          Overruled.

          After reviewing the record, we find that Marks attacked the veracity of the State's
witnesses, and the State's argument in response was proper. "The fact that a person incurs risks
by committing perjury is a matter of common knowledge." Vasquez v. State, 830 S.W.2d 829,
831 (Tex. App.—Corpus Christi 1992, pet. ref'd). Consequently, we find no error in allowing
the argument and overrule point four.
          In point five, Marks contends that the court erred by overruling his objection to the State's
penalty-phase jury argument, in which the State was allowed to argue "wholly outside of the
evidence." The State argued:
          [STATE]:      First of all, this is the punishment phase of the trial. It's not the mercy
phase, it's not the probation phase, so please don't be misunderstood. This
is the punishment phase.
 
The best way to tell what one is going to do in the future is to look
back at their past. And you have heard a lot about this man's past. Our
law allows you to punish him for the offense of resisting arrest and also
take into consideration in your punishment other past criminal acts or acts
of misconduct. I'd like to go over a lot of these things.
 
First of all, we live in a civilized society, and we must have rules
of conduct with consequences for flagrant violations of the rights of others. 
I'm sure you've all read in the newspaper about crime in America or
batterers, people who --
 
          [DEFENSE]: Your Honor, I'm going to object to that as being wholly outside of the
evidence.
 
          [STATE]:      It's a plea for law enforcement, Your Honor.
 
          [DEFENSE]: Your Honor, to invite this jury to relate in any fashion to what they have
read in the newspaper in terms of battering or anything of that nature is
clearly outside of this record. There's been no evidence of it.
 
          THE COURT:          Overruled.
 
          [DEFENSE]: Your Honor, if I could have the additional time for the period of this
objection?

          THE COURT:          At this time I will refuse.
 
          [STATE]:      We have rules. People want to do right. We have to do right. Your are
on the line right now between right and wrong. We need to send a message
from this courtroom. We need to send the proper message.
A review of the record reveals unrefuted evidence that Marks participated in several prior acts of
misconduct involving family violence or "battering."
          A proper plea for law enforcement may take many forms. Borjan v. State, 787 S.W.2d
53, 55 (Tex. Crim. App. 1990). One is to argue the relationship between the jury's verdict and
the deterrence of crime in general. Id. Another is to argue that juries should deter specific crimes
by their verdict. Id. Thus, the State's appeal to the jury that "we must have rules of conduct" in
a civilized society and its attempt to focus the jurors' attention on "crime" or "batterers" was a
proper plea for law enforcement. We overrule point five. 
          Finally, in point six, Marks complains that the court erred by overruling his objection to
the State's punishment-phase argument, in which the State commented that Marks called his
twelve-year-old son to testify "as a sympathy play." The State argued:
          [STATE]:      The defendant wants you to have sympathy for him, and he wants you to
believe that he is so concerned about his children and wife. Let me bring
your attention to some of the things. He's guilty of upsetting his children
by forcefully resisting arrest and causing a scene in front of the children. 
He failed to restrain himself from beating up their mother. Remember
Paula's sworn affidavit for the Protective Order, addressing how fearful the
children [were] of him? Remember the 1989 incident, where he tried to
snatch the children out of the bathtub over at his wife's parents' home, and
he was fighting with his wife, holding that six-month-old infant in his arms? 
You remember he balled up the fist as to hit Doris when she says, "Mark,
please, hand me the child so it won't get hurt"?
 
Don't forget how mindful he was with Sheila Smith's children when
he went over there looking for Sharon Robinson, where he pulled a knife
on Sheila Smith in the presence of her children.
 
Look at how he involved his 12-year-old son, coming in, obviously
as a sympathy play for y'all. Imagine the fear that went through that child's
mind.
 
          [DEFENSE]: Your Honor, I object to that. For this defendant to have invoked his right
to call witnesses, to be chastised therefore in front of this jury, is clearly
improper, especially after the State invited us to bring these witnesses in in
their argument in guilt or innocence.

          THE COURT:          Overruled.
The State argues that its argument was proper because it was a summary of the evidence, a
reasonable deduction from the evidence, and a plea for law enforcement. We disagree. "To argue
that witnesses had been afraid to appear is no less harmful than arguing that their testimony has
been coerced, . . . [and when] unsupported by the evidence, is to inject new and harmful facts
alluding to conduct of the appellant for which he is not on trial." Washington, 822 S.W.2d at 120
(alteration in original) (citing Thomas v. State, 519 S.W.2d 430, 431 (Tex. Crim. App. 1975)).
          Having determined that it was error for the court to overrule Marks' objection, we proceed
to a harm analysis. Harris, 790 S.W.2d at 587; Tex. R. App. P. 81(b)(2). After isolating the
error and all its effects, we cannot say that a rational trier of fact would have reached a different
result if the alleged error and its effects had not resulted. Id. Utilizing the Harris factors, we hold
that, when the comments complained of are viewed in the context of the evidence and the
argument of counsel as a whole, the error was harmless. Id. We overrule point six.
CONCLUSION
          Having concluded that the evidence was sufficient to support a conviction for resisting
arrest, that the court did not err in overruling Marks' Batson challenge concerning the State's
peremptory strike against veniremember Number 6, and that the court did not err in overruling
Marks' objections to the State's argument, we affirm the judgment. 



                                                                                 BILL VANCE
                                                                                 Justice

Before Justice Cummings and
          Justice Vance
Affirmed
Opinion delivered and filed May 22, 1996
Publish